■ Shirley Turner Kinge, Respondent-Appellant, v State of New York, Appellant-Respondent. [915 NYS2d 186]—

Peters, J. Cross appeals from a judgment of the Court of Claims (Midey, Jr., J.), entered July 24, 2009, upon a decision of the court in favor of claimant.

In the early morning hours of December 23, 1989, four members of the Harris family were shot to death in their Tompkins County home. Upon their arrival at the scene later that morning in response to an alarm that had been activated, State Police investigators discovered the bodies of the victims, which had been set on fire, and recovered several objects from the crime scene, including a metal gasoline can. Theorizing that, following the murders, the fire was set in an attempt to destroy any evidence, the can was inspected and tested in an effort to obtain fingerprints. Three days later, police received information that, within hours after the murders, attempts had been made to withdraw cash from various ATMs using bank cards belonging to the victims and credit cards in their names had been used to make purchases at various shopping malls. Based upon information provided by witnesses to the credit card transactions, police prepared composite sketches of a young adult black male and a middle-aged black woman. After receiving several calls identifying claimant as a person fitting the description, the State Police identified her as a potential suspect.

Thereafter, on February 3, 1990, Investigator David Harding advised Senior Investigators David McElligott and Herbert Karl Chandler, both of whom maintained a supervisory role over Harding, that he had found a pair of latent fingerprints on the

gasoline can that matched claimant's fingerprints. Based upon this information, among other things, the police obtained a search warrant for the duplex apartments of claimant and her son. As law enforcement officials attempted to execute the warrant, claimant's son confronted them with a weapon and was killed. Upon a search of the son's apartment, a gun was found which later proved to be the murder weapon.

Claimant was taken into custody and interrogated for nearly seven hours, during which time she admitted that she had used a credit card belonging to one of the victims, but adamantly denied ever having been in their home. Claimant was ultimately indicted on numerous crimes and, following a jury trial, was convicted of burglary, arson, hindering prosecution, criminal possession of stolen property and forgery and sentenced to an aggregate term of 18 to 44 years in prison.

Shortly thereafter, Harding applied for employment with the Central Intelligence Agency. During a polygraph interview, Harding admitted that he had fabricated evidence and committed perjury during the course of a murder case, as well as other cases. This disclosure prompted the Federal Bureau of Investigation to examine fingerprint evidence in various cases in which Harding was involved. It was ultimately determined that Harding had lifted claimant's latent fingerprints during the investigation and planted them on the gasoline can and committed perjury during claimant's prosecution.* As a result, in August 1992, claimant's conviction was vacated and, upon the motion of the Tompkins County District Attorney, the indictment was dismissed.

Claimant thereafter commenced this action against defendant alleging negligence, unjust conviction and malicious prosecution. Following a nonjury trial, the Court of Claims, in a thorough and well-reasoned decision, found defendant liable for negligent supervision and malicious prosecution (*Kinge v State of New York*, 20 Misc 3d 161 [2007]). After a trial on damages, claimant was awarded $250,000 in compensatory damages. These cross appeals ensued.

Defendant contends that the Court of Claims erred in finding it liable for negligent supervision and malicious prosecution. In reviewing a court's verdict following a nonjury trial, "we independently review the weight of the evidence and may grant the judgment warranted by the record, while according due deference to the trial judge's factual findings" (*Martin v Fitzpatrick*,

---

* Harding ultimately pleaded guilty to evidence tampering as well as perjury in connection with his testimony at claimant's criminal trial regarding the fingerprint evidence.

19 AD3d 954, 957 [2005]; *accord Cotton v Beames*, 74 AD3d 1620, 1621-1622 [2010]; *Kallman v Krupnick*, 67 AD3d 1093, 1094-1095 [2009], *lv denied* 14 NY3d 703 [2010]). First addressing claimant's cause of action for negligent supervision, such a claim "requires proof that defendant, as employer, knew or should have known of the employee's propensity for the conduct which caused the injury" (*Brown v State of New York*, 45 AD3d 15, 27 [2007], *lv denied* 9 NY3d 815 [2007] [internal quotation marks and citations omitted]; *see Travis v United Health Servs. Hosps., Inc.*, 23 AD3d 884, 884-885 [2005]; *Hahne v State of New York*, 290 AD2d 858, 859 [2002]).

Here, following recovery of the gas can from the living room of the victims' home, it was immediately subject to extensive examination for possible fingerprint evidence. On December 26, 1989, three days into the investigation, Harding reported to McElligott that he was only able to locate three faint and poor quality latent fingerprints on the can. At this time, Harding also reported that these prints could not be lifted from the can because they would likely be destroyed. Throughout the next month of the investigation, McElligott continued to inquire about the fingerprints, but Harding could not provide him with any usable information. Other more sophisticated efforts to identify the prints likewise proved ineffective. A representative from Kodak was contacted to enhance and photograph the latent prints with oblique lighting, but this attempt was unsuccessful. The can was also taken to the Statewide Automated Fingerprint Identification System for additional analysis and efforts to match the prints. Again, no usable prints could be obtained. McElligott recalled that, following these exhaustive efforts, he dismissed the can as evidence and ceased inquiring about the fingerprints because he was "beating a dead horse."

Then, on February 3, 1990—only after claimant had been identified as a suspect and a mere three days after Harding had gone undercover at claimant's place of employment and met with her—Harding reported to McElligott and Chandler that he now had two sufficient quality latent fingerprints from the gas can that he was able to match to claimant's fingerprints. McElligott himself testified that his suspicions were aroused when Harding made this disclosure, particularly given his recollection that Harding had previously reported that he was only able to obtain three light, unusable fingerprints from the can. Moreover, from that point forward, the record reveals that McElligott grew increasingly uncomfortable with Harding and had ongoing concerns about the fingerprint "evidence" that had been discovered, yet exercised little, if any, oversight over his actions.

Robert Lishansky, a former State Trooper, testified that, during the course of the investigation, McElligott approached him to discuss his concerns about the legitimacy of the fingerprints that Harding had purportedly lifted from the gas can. Investigator Charles Porter similarly expressed concerns to McElligott regarding Harding's behavior, particularly his inappropriate handling of physical evidence. In this regard, immediately following a preliminary hearing at which Harding testified, McElligott confronted Harding regarding the fact that he had the fingerprint card in his pocket without an evidence tag or evidence bag. Despite this clear violation of State Police protocol with respect to the preservation of evidence, coupled with continued concerns about the legitimacy of the prints, McElligott did nothing. He neither made an official report of Harding's mishandling of the evidence nor took steps to ensure that the fingerprint evidence was properly handled and preserved from that point forward—notwithstanding the critical importance of this evidence in the prosecution of claimant.

Additionally, prior to claimant's criminal trial, an investigator from a different State Police troop who was highly experienced in fingerprint identification had been asked to validate the prints. Although this investigator was expected to testify at claimant's trial, McElligott was informed by Lishansky that the investigator was not being called as a witness because he "d[id]n't like the prints." McElligott neither inquired as to why this investigator didn't like the prints nor otherwise pursued the matter. Telling evidence of McElligott's discomfort was revealed through the testimony of Chandler—who had interrogated claimant and was skeptical of her presence at the crime scene—regarding a conversation he had with McElligott during the course of the criminal trial: "I saw [McElligott] in the courthouse, he was watching the monitor and he told me that he was disturbed with how [Harding] had testified about the location of the prints. We specifically had a discussion and I remember saying [']Jesus Christ, you don't think he did something wrong['], and he's like [']well, it's kind of screwed up the way he testified.['] I said [']well God, I wouldn't want to hear that because when I interviewed [claimant] . . . I would have believed she was not in there . . . if it wasn't for that print.[']" Again, in the face of this admitted concern about Harding's veracity and his conduct, McElligott did nothing.

Moreover, during a meeting with the Tompkins County District Attorney prior to claimant's criminal trial, Investigator Martin Hughes, who was trained in fingerprint identification and processing, noted several problems with the handling of the

fingerprint evidence by Harding. Specifically, Hughes noted that the latent fingerprints had not been photographed prior to being lifted from the can, no markings had been made on the can to identify the origin of the fingerprints, and the fingerprint lifters had been cut down from their original size. Hughes testified that he also discussed these problems with Lieutenant Craig Harvey, another of Harding's superiors who was responsible for overseeing the investigation, and acknowledged that such deficiencies were entirely consistent with a fabricated fingerprint. Testimony was presented that State Police protocol required that fingerprints be photographed prior to being lifted so as to verify the origin of the print. According to Vincent Rossetti, a fingerprint expert, there would be no reason to cut down the lifters unless they needed to be fit into a small area, which was not the case here, and that the cutting of the lifters created a situation where it would be more difficult to determine the origin of the print. Notably, it was also learned during the trial that Harding had improperly wiped down the gas can, thereby eliminating any proof that the fingerprints had ever been on the can in the first instance. Although McElligott testified that he was unaware of these violations of protocol, this fact further supports the conclusion that Harding was not subject to any meaningful supervision during the investigation and prosecution of claimant. Indeed, as McElligott himself acknowledged, the identification unit of which Harding was a member "w[as]n't really supervised by anyone."

Based on all of this evidence, we fully agree with the Court of Claims' finding that "McElligott, who had previously expressed doubt as to the existence of any usable fingerprint evidence whatsoever and had concerns as to the reliability of the evidence produced by Investigator Harding, by his lack of action and oversight, provided Investigator Harding with the opportunity not only to fabricate fingerprint evidence, but also to then proceed, without challenge or any realistic fear of detection, in providing false testimony regarding such evidence" (20 Misc 3d at 171). Thus, after independently reviewing the evidence and giving due deference to the Court of Claims' credibility assessments, we conclude that the evidence fully supports a finding of negligent supervision.

Nor do we find any basis to set aside the Court of Claims' verdict finding defendant liable for malicious prosecution. "The gravamen of a civil malicious prosecution cause of action is the wrongful initiation, procurement or continuation of a legal proceeding" (*Campion Funeral Home v State of New York*, 166 AD2d 32, 36 [1991], *lv denied* 78 NY2d 859 [1991] [citations

omitted]; *accord Perryman v Village of Saranac Lake*, 41 AD3d 1080, 1081 [2007]). To succeed on such a claim, a party must establish "that a criminal proceeding was commenced, that it was terminated in favor of the accused, that it lacked probable cause, and that the proceeding was brought out of actual malice" (*Martinez v City of Schenectady*, 97 NY2d 78, 84 [2001]; *see Cantalino v Danner*, 96 NY2d 391, 394 [2001]). Here, defendant does not dispute that the first two elements have been satisfied, but argues that claimant failed to prove the absence of probable cause and actual malice.

"Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe [claimant] guilty" (*Colon v City of New York*, 60 NY2d 78, 82 [1983] [citations omitted]; *accord Fink v Shawangunk Conservancy, Inc.*, 15 AD3d 754, 755 [2005]). Notably, even where there exists probable cause to effectuate an arrest, " '[t]he continuation of a criminal proceeding without probable cause may support a cause of action for malicious prosecution' " (*Putnam v County of Steuben*, 61 AD3d 1369, 1370 [2009], *lv denied* 13 NY3d 705 [2009], quoting *Kemp v Lynch*, 275 AD2d 1024, 1026 [2000]; *see Oakley v City of Rochester*, 71 AD2d 15, 18 [1979], *affd* 51 NY2d 908 [1980]). Although a grand jury indictment creates a presumption of probable cause (*see Colon v City of New York*, 60 NY2d at 82), that presumption is overcome by evidence of "fraud, perjury or the misrepresentation or *falsification of evidence*" (*Broughton v State of New York*, 37 NY2d 451, 456 [1975], *cert denied* 423 US 929 [1975] [emphasis added]; *see Brown v City of New York*, 92 AD2d 15, 17-18 [1983], *affd* 60 NY2d 893 [1983]; *Boose v City of Rochester*, 71 AD2d 59, 69 [1979]).

Here, the trial testimony established that probable cause to continue with the criminal proceeding against claimant was based upon three pieces of evidence. The first was, obviously, the fingerprint evidence, which Harding knew had been falsified. The second piece of evidence was the statement of Dean Sutphin, a neighbor of the victims, in which he identified claimant as the passenger of a slow-moving van that was driving near the victims' home at the time of the crimes. Sutphin, however, retracted his identification shortly before claimant's arrest and, without it, police had no eyewitness evidence placing claimant at or near the scene of the crime at the time when the crimes occurred. Disregarding the falsified evidence (*see e.g. Hernandez v State of New York*, 228 AD2d 902, 904-905 [1996]) and Sutphin's retracted identification, the only other evidence potentially implicating claimant in the burglary and arson was

her use and possession of a credit card of one of the victims within a few hours of the murders. The question thus distills to whether claimant's use and possession of the stolen credit card, by itself, established probable cause to prosecute her for the crimes committed at the victims' home.

While acknowledging that the fabricated fingerprints were the only direct evidence placing claimant at the murder scene, the Tompkins County District Attorney testified at the civil trial that, solely on the basis of claimant's use and possession of the stolen credit card, he would have presented the case to a grand jury for indictment on charges related to claimant's presence at the murder scene. He testified further that, in his opinion, such evidence by itself would have been sufficient to sustain a conviction for those crimes under the "recent exclusive possession" rule. That rule provides, as pertinent to the facts of this case, that "[i]f a defendant is found in exclusive possession soon after the crime and there is *no evidence indicating that he [or she] may have received the stolen property from someone else*, the only inference that can be drawn is that defendant is the thief" (*People v Baskerville*, 60 NY2d 374, 382 [1983] [emphasis added]). Here, however, there was evidence that claimant did, in fact, receive the stolen property from her son, including her admissions to police to that effect and undisputed proof that both she and her son possessed and used the credit cards shortly after the murders. As such, a jury would not properly be permitted to infer that claimant was the actual burglar and not simply a receiver of stolen goods (*see id.* at 383; *People v Galbo*, 218 NY 283, 290-291 [1916]; *see e.g. People v Keelan*, 189 AD2d 625, 626 [1993], *lv denied* 81 NY2d 972 [1993]; *People v Schillaci*, 68 AD2d 124, 126-128 [1979]; *People v Mobley*, 33 AD2d 888 [1969]). More importantly, as noted by the Court of Claims, the District Attorney's testimony in this regard was completely at odds with his actions after it was revealed that Harding had falsified the fingerprint evidence. At that time, the District Attorney moved to dismiss the indictment, stating in his affidavit that "there is no reliable evidence that [claimant] was at the Harris home" and that the prosecution therefore "lacks proof of [claimant's] guilt of those crimes." The Court of Claims credited the District Attorney's statements made in support of the application for dismissal over his current testimony, and we defer to its resolution of this credibility issue (*see Shirvanion v State of New York*, 64 AD3d 1113, 1115 [2009]; *Conolly v Thuillez*, 58 AD3d 973, 974 [2009]; *Krafchuk v State of New York*, 250 AD2d 962, 964 [1998]). Thus, the Court of Claims' conclusion that probable cause did not exist to prosecute claimant for the crimes occurring at the Harris home is sup-

ported by a fair interpretation of the evidence. Furthermore, the falsification of the fingerprint evidence demonstrated such a disregard of claimant's rights as to support an inference of malice (*see Hernandez v State of New York*, 228 AD2d at 905). Accordingly, the finding of liability on claimant's malicious prosecution claim was likewise warranted.

Finally, with respect to claimant's cross appeal, we find no basis upon which to disturb the Court of Claims' damages award. "Generally, a plaintiff in a malicious prosecution action may recover damages for the direct, natural and proximate results of the criminal prosecution, including those for suffering arrest and imprisonment, injury to reputation and character, injury to health, well-being and feelings, and counsel fees and expenses in defending the criminal prosecution" (*Burlett v County of Saratoga*, 111 AD2d 426, 427 [1985] [citations omitted]; *accord Putnam v County of Steuben*, 61 AD3d at 1371). Here, claimant was imprisoned for $2^{1}/_{2}$ years of the 18 to 44-year sentence that had been imposed for her commission of the charged crimes. She testified that, as a result of her arrest and prosecution for the crimes placing her at the scene of the horrific murders, she suffered from depression and mental anguish, has become fearful of being recognized in public and has been unable to obtain full-time employment. Claimant also presented the testimony of a friend and former employer who detailed the changes in claimant's personality and appearance following her arrest, conviction, imprisonment and subsequent release. Having credited this testimony, the Court of Claims based its damages award on the mental anguish and emotional distress suffered by claimant during her prosecution and $2^{1}/_{2}$-year incarceration for crimes which she did not commit, as well as her loss of liberty while incarcerated, but declined to make any award for damage to reputation and character. Noting that claimant did not have clean hands, the court found that the claimed damage to her character and reputation were caused by her own conduct in wrongfully using the credit card of one of the homicide victims and committing a crime by forging the victim's signature. Considering all of the circumstances, including the emotional and mental harm incurred by claimant as a result of the despicable acts of the police as well as claimant's admitted criminal conduct that initially led police to identify her as a suspect, we find that the award of $250,000 does not deviate materially from what is reasonable compensation (*see* CPLR 5501 [c]; *Dobies v Brefka*, 45 AD3d 999, 1001 [2007]).

Mercure, J.P., Malone Jr., Stein and McCarthy, JJ., concur. Ordered that the judgment is affirmed, without costs.