[990 NYS2d 473]

LARRY D. MARTIN, Appellant, v DAILY NEWS L.P. et al., Respondents, et al., Defendant. (And Another Action.)

First Department, July 17, 2014

## APPEARANCES OF COUNSEL

*Heller, Horowitz & Feit, P.C.,* New York City (*Stuart A. Blander* and *Harold L. Schwab* of counsel), for appellant.

*Davis Wright Tremaine LLP*, New York City (*Laura R. Handman* of counsel), and *Daily News, L.P.*, New York City (*Mathew A. Leish* of counsel), for respondents.

**OPINION OF THE COURT**

SAXE, J.

In this defamation case, plaintiff Larry D. Martin, a Justice of the New York State Supreme Court, Kings County, alleges that defendants Daily News and its columnist Errol Louis published two columns that falsely accused him of presiding over a $20 million real estate litigation despite a conflict of interest, and suggested that he was corrupt. The issues raised on this appeal include whether Justice Martin, a public figure, satisfied the standard of *New York Times Co. v Sullivan* (376 US 254, 279-280 [1964]), by showing that Louis and the Daily News acted with a reckless disregard for the truth.

The columns at issue, published by the Daily News in both its print and online editions, reported on a lawsuit that businessman Martin Riskin and his wife, represented by attorney Ravi Batra, brought against attorney Jerome Karp. Batra and Karp are both active in Brooklyn politics; according to the complaint, Karp was the longtime chairman of the Judicial Screening Committee of the Kings County Democratic Party, and Batra had served on the Committee.

The *Riskin v Karp* complaint, on which Louis based his columns, charged Karp with fraud, abuse of process, and violation of Judiciary Law § 487, in connection with Karp's alleged role of "shadow counsel" for an individual identified as Ted Singer in a group of real-estate-related lawsuits in Kings County between Riskin and Singer. As they relate to Justice Martin, the allegations concerned the Justice's conduct in the course of presiding over a separate foreclosure proceeding Riskin had brought against another individual—to which Singer was not a party—encaptioned *Martin Riskin v Johnny Belinda*.

*Riskin v Belinda*

The *Belinda* foreclosure action, assigned to Justice Martin in 1999, was brought by Riskin as mortgagee against the mortgagor on a piece of property. On July 25, 2000, Singer, represented by attorney Sol Mermelstein, made a motion to intervene in the *Belinda* foreclosure proceeding. The motion was returnable August 8, 2000, and adjourned to October 10, 2000. However, by letter to the court dated September 12, 2000, Mermelstein asked to withdraw the motion due to a bankruptcy petition filed by

the mortgagor, which stayed the foreclosure action. Riskin, represented by Batra, objected to the unilateral withdrawal of Singer's motion, so at the October 10, 2000 court appearance, the court heard and granted Singer's application to be permitted to withdraw his intervention motion.

More than eight months later, on June 27, 2001, while the court was still treating the *Belinda* proceeding as stayed by the bankruptcy petition, Riskin made a motion under Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1 for sanctions against Singer and Mermelstein, contending that the intervention motion in the *Belinda* matter was frivolous; Singer cross-moved for sanctions against Riskin and Batra. The motions were administratively handled as stayed pursuant to the bankruptcy filing.

On October 12, 2000, the Commission on Judicial Conduct began an investigation of Justice Martin, and on November 1, 2000, Justice Martin retained Karp to represent him before the Commission. The matter concluded in a public admonition dated June 6, 2002,[1] at which time Karp's representation of Justice Martin ceased.

On January 24, 2005, the *Riskin v Belinda* foreclosure proceeding was restored to active litigation status, and the sanctions motions were restored to Justice Martin's motion calendar. However, the motions were repeatedly adjourned over the months that followed. At no time throughout these months did Karp appear on behalf of Singer.

It was in the context of these adjournments of the sanctions motions between Riskin and Singer in *Riskin v Belinda* during 2005 that Karp's name and connection to Singer was first interjected into the discussion with Justice Martin. After an adjournment of the motions from the July 15, 2005 calendar, the attorney then acting as counsel for Singer, Regina Felton, protested in a July 22, 2005 letter to the Administrative Judge, with a copy to Justice Martin, that Batra's application for the adjournment had been granted "despite Mr. Batra's default," and requested that Riskin's motion be marked off the calendar. Batra's responsive letter of July 25, 2005 referred to "a possible problem I have been intending to raise before J. Martin." Batra's letter then referred to a January 2005 application, made

---

**1.** The Commission sustained the charges that in two separate criminal matters, Justice Martin wrote letters directly to the assigned judges, seeking favorable consideration for the defendants, each of whom was a son of longtime family friends.

not in the *Belinda* mortgage foreclosure before Justice Martin but in *Singer v Riskin*, over which another justice was presiding. In that matter, attorney Robert Allan Muir, Jr. asked to be relieved as counsel for Singer, and in his application he referred to Karp as "the referring attorney." Batra's July 25, 2005 letter concluded, "My clients await your Honor's guidance," and did not ask for Justice Martin's recusal.

On August 12, 2005, the sanctions motions in the *Belinda* matter were before Justice Martin. Batra did not appear, but sent a substitute attorney to ask for a further adjournment to allow Mr. Batra to appear and argue the matter. Because the matter had been marked final and all parties had been so notified, the application for a further adjournment was denied. At that point the substitute attorney, Howard Birnbach, made an oral application for Justice Martin's recusal, based on the claim that Karp represented both Singer and Justice Martin. Justice Martin denied the application. He subsequently denied both sanctions motions on August 3, 2006.

The foregoing procedural summary makes it clear that while Justice Martin handled *Riskin v Belinda*, there was no objective basis for him to believe that Karp had any connection to that matter.

### *Riskin v Karp*

The *Riskin v Karp* complaint, dated November 8, 2006, essentially alleged that Karp had used his connections with the judiciary for the benefit of Singer as he secretly orchestrated Singer's "global" litigation against Riskin. As relevant to Justice Martin's defamation claim, the complaint alleged that: (1) Justice Martin presided over *Riskin v Belinda*; (2) Karp represented Justice Martin in a matter before the Commission on Judicial Conduct during 2000-2001; (3) Singer made a motion in 2000 to intervene in *Riskin v Belinda*; (4) Karp was *secretly* serving all along as "illegal shadow counsel" to Singer in his many lawsuits involving Riskin; (5) by letter dated February 2, 2005, Singer formally retained Karp to act as his agent for the purpose of attempting to negotiate a global settlement of his legal disputes with Riskin; and (6) on August 12, 2005, Justice Martin denied a request by Riskin's counsel to recuse himself in *Riskin v Belinda*, rejecting the claim that he had a conflict of interest.

Batra, the lawyer who represented Riskin in *Riskin v Karp*, met with Louis in January 2007 to talk about the lawsuit, and provided Louis with a copy of the complaint. Louis then

published two separate columns on the "Opinion" page of the Daily News print edition and online version, the first on January 28, 2007, the second on February 8, 2007.

The Columns

The topic heading of Louis's January 28, 2007 column reads, "Corruption," and its opening lines assert, "The complicated world of judicial corruption in Brooklyn—a snake pit filled with bribery and back-room political deals—is about to be blown wide open by a longtime insider who has decided to start talking publicly about what he knows. And Ravi Batra knows plenty." The column refers to the "sprawling $20 million dispute between two Brooklyn real estate families—the Riskins and the Singers," and reports that, according to the lawsuit brought on behalf of the Riskins against Karp,

> "Karp secretly took payments from . . . Ted Singer, and provided legal advice and strategy to him—all without disclosing the fact that Karp once represented Supreme Court Justice Larry Martin, the judge hearing the multimillion-dollar case. In plain English, Batra claims that Karp tried to rig the case by simultaneously representing Singer and the judge hearing his case."

Louis's article concludes that "Batra says the suit will expose the inner workings of the Brooklyn judge-making apparatus," that "[l]ocal and federal prosecutors have been alerted," and that "prosecutors should follow up with Batra immediately and get to the bottom of a case that could make [Clarence] Norman's alleged crimes look like a church picnic."

In sum, in relation to Justice Martin, Louis's column inaccurately reported that according to the complaint and information Batra provided to him, Justice Martin was presiding over a matter in which Karp "simultaneously" represented the judge and one of the parties in the matter, which constituted judicial corruption.

The February 8, 2007 column was entitled "Weed out bad judges," and sub-headed "More resources will help nail corrupt jurists." It began by discussing the need to combat corruption and scandal in the court system, referred to two former judges who had been removed or were serving time in prison, and then proceeded to "the case of Justice Larry Martin," who, it explained, had been admonished by the Commission on Judicial Conduct for letters asking other judges to impose lenient sentences on his family friends. The column then asserted,

"Now the judge is in the hot seat again. According to a lawsuit filed in November, Martin is hearing a real estate case, Singer vs. Riskin, in which *the judge's personal lawyer*—Jerome Karp, who defended Martin before the commission in the letter-writing cases—is representing one of the parties in the case, Ted Singer. That's an obvious conflict of interest. Martin should have disclosed the Karp connection and recused himself from the case—but he didn't. So Tembeckjian's staff will need to spend time and money to sort through the charges."

So, in the second column as well, Louis inaccurately reported the facts and the allegations, in that: (1) Justice Martin was not hearing the *Singer v Riskin* "global" real estate litigation, but only the *Riskin v Belinda* foreclosure proceeding; (2) Karp, who had represented Justice Martin before the Commission on Judicial Conduct, was not representing either of the parties in the foreclosure case before Justice Martin; and (3) even when Singer attempted to intervene in, and made motions in, the foreclosure matter being heard by Justice Martin, he was not represented by Karp. Indeed, Batra's claim in the *Riskin v Karp* complaint that Karp was serving as Singer's "illegal shadow counsel"—a term Batra coined to accuse Karp of secretly acting on Singer's behalf—recognized that the role allegedly played by Karp was not acknowledged in the context of the court proceedings.

Years later, after the Daily News's website switched to a new content-management system, it was discovered that some content had been lost from the website. Specifically, in March 2010, defendants discovered that Louis's two columns were no longer posted on the website, and they restored the columns to the website. Defendants' explanation is that in-house counsel were concerned that the omission of the columns from the website might be interpreted as an admission of liability or destruction of evidence.

The Defamation Actions

Justice Martin's first defamation action was commenced against the Daily News, Louis and Batra in 2008, based upon the foregoing Daily News columns, as well as a number of subsequent blog postings. He commenced a second action against the Daily News and Louis on March 14, 2011, based on the alleged republication in March 2010, when the Daily News restored the unintentionally deleted columns to its digital archives.

The complaint in the first action stated that the assertions against Justice Martin of corruption or conflict of interest in the columns were false. Justice Martin asserted that he never presided over the "sprawling $20 million dispute" between Singer and Riskin, but rather, he only presided over a separate mortgage foreclosure proceeding that Riskin brought against a single mortgagor, *Riskin v Belinda,* in which Singer's only involvement was: (1) a motion to intervene brought on July 25, 2000 and withdrawn on October 10, 2000, in which Singer was represented *not* by Jerome Karp, but by Sol Mermelstein; (2) a motion brought on June 27, 2001 by Batra on behalf of Riskin, seeking sanctions against Singer and Mermelstein for Singer's motion to intervene; and (3) a cross motion for sanctions then brought by Singer against Riskin and Batra. Justice Martin's complaint pointed out that Karp played no apparent role in Singer's motions in *Riskin v Belinda* and that Justice Martin had no means of knowing about any secret involvement on Karp's part at that time.

Defendants' Motions

Defendants moved to dismiss the first complaint, arguing that the columns were not defamatory, that they were non-actionable opinion, that they were privileged under Civil Rights Law § 74, and that Justice Martin could not adequately plead, or show, that defendants acted with the requisite actual malice, that is, reckless disregard of whether the statements were false or not.

In an order entered July 20, 2009, the motion court granted dismissal of all claims against Batra and those related to the first column and the blog postings.[2] However, it declined to dismiss the defamation claim based on the second column.

Following discovery, the remaining defendants moved for summary judgment. In an order entered December 5, 2012, the court granted summary judgment dismissing all remaining claims (37 Misc 3d 1229[A], 2012 NY Slip Op 52230[U] [2012]). It concluded that Justice Martin had failed to come forward with sufficient evidence to establish actual malice.

The second action, alleging that the restoration of the columns to the website in March 2010 despite knowledge of the errors in the columns constituted republication of the defamation, was dismissed by order entered February 10, 2012, on the

---

**2.** Justice Martin does not appeal from the dismissal of the complaint as against Batra, or from the aspect of the order concerning the blog postings.

ground that the restoration did not constitute a separate publication.

Discussion

## Defamatory Content

Initially, we reject defendants' contention that the contents of the columns were not reasonably susceptible of a defamatory interpretation.

"Making a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace constitutes defamation" (*Thomas H. v Paul B.*, 18 NY3d 580, 584 [2012]). "In analyzing the [published] words in order to make that threshold decision, the court must . . . consider them in context, . . . give the language a natural reading" (*Weiner v Doubleday & Co.*, 74 NY2d 586, 593 [1989], *cert denied* 495 US 930 [1990]), and "test[ ] [them] against the understanding of the average reader" (*Aronson v Wiersma*, 65 NY2d 592, 594 [1985]).

■ The motion court found that the first column contained only a passing reference to Justice Martin, and accused only Karp—not Justice Martin—of trying to "rig" the case. However, as in *Cole Fisher Rogow, Inc. v Carl Ally, Inc.* (29 AD2d 423, 426 [1st Dept 1968], *affd* 25 NY2d 943 [1969]), the court must consider the news item together with the headline or heading that introduces it. Here, the first column must be read in light of the topic heading, situated above the column's headline, namely, the word "Corruption." We must also pay attention to the opening words of the column, referring to "[t]he complicated world of judicial corruption in Brooklyn." With those references in mind, we find that the erroneous statement in the first column, that Justice Martin was "hearing the multimillion-dollar case" which Karp "tried to rig . . . by simultaneously representing Singer and the judge hearing his case," and that "prosecutors should . . . get to the bottom of [the] case," constitutes more than just an accusation against Karp. It implicitly asserts that Justice Martin is part of that case-rigging. When viewed in this light, the first column supports a claim that the content of this publication was defamatory by implication.

■ The second column discusses two jurists who were either removed or sent to prison, then proceeds to "[t]ake the case of Larry Martin," as if Justice Martin were another example of a judge who should be removed or sent to prison. Reading this column as a whole, the average reader could view it as an indict-

ment of the Brooklyn judiciary as corrupt, in which Justice Martin is offered up as an example. A claim that the column's content was defamatory, either expressly or by implication, is therefore made out (*see Armstrong v Simon & Schuster*, 85 NY2d 373, 380-381 [1995]).

## Opinion

Of course, "only statements of fact can be defamatory because statements of pure opinion cannot be proven untrue" (*Thomas H. v Paul B.*, 18 NY3d at 584). Expressions of opinion, "even in the form of pejorative rhetoric, relating to fitness for judicial office or to performance while in judicial office," are not actionable (*Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, 380 [1977], *cert denied* 434 US 969 [1977] [*Rinaldi I*]; *see Mann v Abel*, 10 NY3d 271 [2008], *cert denied* 555 US 1170 [2009]).

We observe initially that the column's position on the "Opinion" page of the newspaper is not dispositive of the issue whether the challenged statements are protected opinion (*see Mann v Abel*, 10 NY3d at 277).

While a statement that a judge is incompetent or unfit for office merely expresses an opinion about the judge's performance in office (*Rinaldi I*, 42 NY2d at 381), a published statement that a judge is corrupt is not equivalent to an opinion about the judge's fitness for office. The *Rinaldi I* Court considered a journalist's assertion that the plaintiff judge was "probably corrupt," and observed that a reader would understand those words, in the context of the article, "as meaning that plaintiff had committed illegal and unethical actions" (*id.* at 382). It concluded that this type of accusation is not protected opinion.

The explicit and implicit accusations of judicial corruption in these columns fall within this category and therefore cannot be treated as protected opinion.

## The Civil Rights Law § 74 Privilege

Even news articles containing false factual statements capable of defamatory interpretation will be protected by the absolute privilege afforded by Civil Rights Law § 74 if the gist of the articles constitutes a "fair and true report" (*see McRedmond v Sutton Place Rest. & Bar, Inc.*, 48 AD3d 258, 259 [1st Dept 2008]). Civil Rights Law § 74 states that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding," and the privilege applies to reports about legal pleadings (*see McRedmond*, 48 AD3d at 259). "When determin-

ing whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision" (*Alf v Buffalo News, Inc.*, 21 NY3d 988, 990 [2013], quoting *Holy Spirit Assn. for Unification of World Christianity v New York Times Co.*, 49 NY2d 63, 68 [1979]). Rather, the question is whether the article "provided substantially accurate reporting" (*see Alf*, 21 NY3d at 990).

While the first column is largely comprised of assertions about what "Batra's complaint . . . alleges," Louis also provides his own interpretation of the complaint, inaccurately stating, "In plain English, Batra claims that Karp tried to rig the case by simultaneously representing Singer and the judge hearing his case." The inaccuracies in this statement—namely, that Justice Martin was hearing the multimillion dollar *Riskin-Singer* case, rather than the foreclosure case against Belinda, and that the *Riskin v Karp* complaint alleged that Karp was representing Singer in the action before Justice Martin while he was also representing Justice Martin—are more than technical inaccuracies. They lie at the heart of the defamation by which Louis conveyed to the reader the accusation that Justice Martin, whom Louis characterized as a corrupt judge, presided over the global litigation between Riskin and Singer, and that he knowingly did so despite a disabling conflict of interest.

The readers were not informed that Singer's involvement in the *Belinda* foreclosure matter assigned to Justice Martin was limited to a quickly withdrawn motion by Singer to intervene, followed by cross motions for sanctions; nor were they made aware that Karp did not represent Singer on any of those motions. The readers were also not made aware that the *Riskin v Karp* complaint alleged that Karp's involvement in Singer's litigation was as something Batra had dubbed a "shadow counsel," playing a secret role that was not acknowledged until 2005. As a result of this missing information and Louis's careless reporting, the columns created a false impression that Justice Martin was mixed up in corruption.

The *New York Times Co. v Sullivan* Standard

Although we agree with Justice Martin that the published columns were susceptible of a defamatory interpretation, were not protected opinion, and were not privileged under Civil Rights Law § 74, that is not the end of the inquiry; Justice Martin had to also clear the demanding hurdle presented by the standard set in *New York Times Co. v Sullivan* (376 US 254, 279-280 [1964]). Since he is a public figure, he had the burden

of showing, with convincing clarity, actual malice—that is, that the author and publisher of the columns acted with reckless disregard for the truth (*Freeman v Johnston*, 84 NY2d 52, 56 [1994], *cert denied* 513 US 1016 [1994]). "The standard is a subjective one, focusing on the speaker's state of mind" (*Hoesten v Best*, 34 AD3d 143, 155 [1st Dept 2006]). This standard of "convincing clarity" applies even on a motion for summary judgment (*Freeman v Johnston*, 84 NY2d at 56-57).

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication" (*St. Amant v Thompson*, 390 US 727, 731 [1968]). "[I]t is essential that the First Amendment protect some erroneous publications as well as true ones" (*id.* at 732). Therefore, to prevail, Justice Martin was required to offer a showing tending to establish that Louis " 'in fact entertained serious doubts as to the truth of his publication,' or acted with a 'high degree of awareness of [its] probable falsity' " (*Masson v New Yorker Magazine, Inc.*, 501 US 496, 510 [1991] [citation omitted], quoting *St. Amant*, 390 US at 731, and *Garrison v Louisiana*, 379 US 64, 74 [1964]).

In support of his argument that he satisfied the standard, Justice Martin cites portions of Louis's deposition testimony. At one point, Louis stated that in his view, "the entire essence of the problem related to recusal and possible conflict of interest was that it was not clear what role Jerome Karp played, in following or not following whatever he did, following his authorization to resolve all of the cases." Louis explained that in his view, the claim of "conflict of interest" turned on whether or not Karp was involved in the case in any manner; he thought that the letter from February of 2005 authorizing Karp to resolve all of Singer's conflicts with Riskin was key.

Louis also explained that his reference to "Singer v Riskin" was used as a way to indicate the entire group of cases involving Riskin and Singer, not merely the case with that caption. He acknowledged that it was inaccurate to say that Justice Martin was the judge hearing the multimillion dollar case, but explained that he did not think "the nature of the case or the size of the case [was] really very relevant or germane to the issue of not resolving a conflict of interest."

Justice Martin emphasizes Louis's admission that although he did not know what role Karp had played, he never-

theless accused Justice Martin of a conflict of interest based on Karp's involvement. However, none of Louis's testimony satisfies the actual malice standard. The only issue here is whether Justice Martin presented evidence sufficient to create an issue of fact as to whether he could prove, by clear and convincing evidence, that Louis knew that Justice Martin's conduct did not involve a conflict of interest. This he failed to do.

The letter in which Singer authorized Karp to act as his agent to negotiate a settlement neither definitively established nor definitively disproved that Karp was acting as Singer's attorney before or at that time. Louis's reliance on the authorization letter to justify his reasoning that Karp was actually representing Singer was not entirely unreasonable; his testimony fails to rise to the level of establishing that he " 'entertained serious doubts as to the truth of his publication,' or acted with a 'high degree of awareness of [its] probable falsity' " (*Masson v New Yorker Mag.*, 501 US at 510 [citation omitted]). Rather, Louis's sometimes inaccurate reporting about the *Riskin v Karp* lawsuit and Justice Martin's conduct was simply sloppy and careless.

The Re-Posting of the Deleted Columns

Justice Martin posits that the re-posting of Louis's columns in 2010 constituted an actionable republication of the defamatory statements.

Under the "single publication rule," the publication of a defamatory statement in a single issue of a newspaper or magazine, although widely circulated and distributed, constitutes one publication, which gives rise to one cause of action, and the statute of limitations runs from the date of that publication (*Gregoire v Putnam's Sons*, 298 NY 119, 123 [1948]). This rule applies to publications on the Internet (*Firth v State of New York*, 98 NY2d 365, 369 [2002]), so continuous access to an article posted via hyperlinks to a website is not a republication (*see Haefner v New York Media, LLC*, 82 AD3d 481 [1st Dept 2011]). However, this case does not involve continuous access on a website; the columns were missing from the Daily News website for three years.

An exception to the single publication rule has been applied when the following factors are present: "the subsequent publication is intended to and actually reaches a new audience," "the second publication is made on an occasion distinct from the initial one," "the republished statement has been modified in form or in content," and "the defendant has control over the decision to republish" (*see Hoesten v Best*, 34 AD3d at 150-151).

Thus, for example, repetition of a defamatory statement in a later edition of a book, magazine or newspaper may give rise to a new cause of action (*Rinaldi v Viking Penguin*, 52 NY2d 422, 433-435 [1981] [*Rinaldi II*]).

Justice Martin points out that the new posting actually reached a new audience, observing that the restored columns included new hyperlinks to social media and networking sites. Moreover, even if defendants initially harbored no serious doubts as to the truth of Louis's assertions, by the time the columns were re-posted they had to know the substance of Justice Martin's lawsuit, and could no longer legitimately claim that they were unaware of the inaccuracies.

■ However, we agree with the conclusion of the motion court that the re-posting did not constitute republication under *Rinaldi II*.

Had the columns remained on the Daily News website as was intended, their presence there three years later would not have justified any additional action. Their inadvertent deletion during a changeover to a new computer content-management system, and their restoration once that inadvertent deletion was discovered, was not geared toward reaching a new audience. The columns were not modified in any substantial way, and their restoration was, as characterized by the motion court, akin to a delayed circulation of the original. Therefore, Justice Martin's second action, based on the claim of republication, is time-barred.

We have considered Justice Martin's argument as to defendants' use of an expert opinion on legal ethics and find it unavailing.

Accordingly, the judgment of the Supreme Court, New York County (Martin Shulman, J.), entered June 11, 2013, dismissing the complaint in the first action (index No. 100053/08) as against defendants Daily News L.P. and Errol Louis, should be affirmed, without costs. The appeal from the order, same court and Justice, entered December 5, 2012, should be dismissed, without costs, as subsumed in the appeal from the judgment. The order, same court and Justice, entered February 10, 2012, which granted defendants' motion to dismiss the complaint in the second action (index No. 103129/11), should be affirmed, without costs.

Gonzalez, P.J., Tom and Andrias, JJ., concur.

Judgment, Supreme Court, New York County, entered June 11, 2013, affirmed, without costs. Appeal from order, same court

and Justice, entered December 5, 2012, dismissed, without costs, as subsumed in the appeal from the judgment. Order, same court and Justice, entered February 10, 2012, affirmed, without costs.