Partridge v State of New York (2019 NY Slip Op 03715)





Partridge v State of New York


2019 NY Slip Op 03715


Decided on May 9, 2019


Appellate Division, Third Department


Pritzker, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 9, 2019

526704

[*1]ROBERT PARTRIDGE, Respondent- Appellant,
v
STATE OF NEW YORK, Appellant- Respondent.

Calendar Date: March 18, 2019

Before: Egan Jr., J.P., Lynch, Clark, Devine and Pritzker, JJ.


Letitia James, Attorney General, Albany (Jonathan D. Hitsous of counsel), for appellant-respondent.
LaFave Wein & Frament PLLC, Guilderland (Paul H. Wein of counsel), for respondent-appellant.



OPINION AND ORDER
Pritzker, J.
(1) Appeal from a decision of the Court of Claims (Hard, J.), entered October 25, 2013, in favor of claimant, and (2) cross appeals (a) from a decision of said court, entered July 18, 2017 in favor of claimant, and (b) from the judgment entered thereon.
On June 17, 2008, the State Police held a press conference to
publicize an initiative called "Operation Safe Internet" (hereinafter the initiative). At the press conference, Pedro Perez, then First Deputy Superintendent of the State Police, explained that this initiative was championed by the Internet Crimes Against Children Task Force, which was established to "investigate and prosecute crimes involving the online sexual exploitation of children." While Perez spoke, he stood before a large sign that depicted a child looking at a computer and included the words, "Internet Crimes Against Children." Also part of the presentation were large poster boards that included photographs of the approximately 60 individuals who were arrested during this initiative. Among the photographs was one of claimant, who had never been convicted or charged with a crime involving the sexual exploitation of a child. The press conference aired on various news channels, including WTEN Channel 10 News, located in the City of Albany. During WTEN's coverage of the press conference, many of the photographs of those arrested were displayed, including that of claimant.
In June 2009, claimant filed a claim against defendant for defamation and requested damages in the amount of $750,000. Thereafter, defendant answered and asserted the defense of qualified privilege. After a bifurcated trial, the Court of Claims determined that claimant had proven his case by a preponderance of the evidence and subsequently awarded claimant [*2]$300,000. These appeals and cross appeals ensued, with defendant challenging the liability determination and claimant alleging that the damage award is insufficient.[FN1]

Defendant challenges the Court of Claims' determination with respect to liability, arguing that claimant failed to make the requisite showing for defamation by implication, which defendant argues is the only cognizable theory for the claim [FN2]. "A claim of defamation requires proof that the defendant made a false statement, published that statement to a third party without privilege, with fault measured by at least a negligence standard, and the statement caused special damages or constituted defamation per se" (Dickson v Slezak, 73 AD3d 1249, 1250 [2010] [internal quotation marks and citations omitted]; see Jackie's Enters., Inc. v Belleville, 165 AD3d 1567, 1569-1570 [2018]). As to the first element, defamation by implication does not require that a direct statement is, in and of itself, false; rather, it is premised on "false suggestions, impressions and implications arising from otherwise truthful statements" (Armstrong v Simon & Schuster, 85 NY2d 373, 380-381 [1995]; accord Stepanov v Dow Jones & Co., Inc., 120 AD3d 28, 35 [2014]). Indeed, defamation by implication can include statements whose falsity is based not on what was said, but rather "by omitting or strategically juxtaposing key facts" (Martin v Hearst Corp., 777 F3d 546, 552 [2d Cir 2015]). In determining whether claimant has proven this first element of defamation, defendant urges this Court to adopt a heightened level of proof and require claimant to "make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference" (Stepanov v Dow Jones & Co., 120 AD3d at 37-38).

In determining whether to adopt this heightened standard, we are mindful of the reason for doing so; the suspect communication can impart two distinct contextual meanings and, although one of these meanings is false, the other is true. Accordingly, any limitation imposed upon communication must be scrupulously balanced against the fundamental rights guaranteed by the First Amendment, including "protection for publishing substantially truthful statements" (Stepanov v Dow Jones & Co., 120 AD3d at 38, citing Armstrong v Simon & Schuster, 85 NY2d at 381). To ensure this balance remains inviolate, both the First Department (see Stepanov v Dow Jones & Co., Inc., 120 AD3d at 37-38) and the Second Department (see Udell v NYP Holdings, Inc., 169 AD3d 954, 957 [2019]) have imposed this "rigorous" evidentiary standard when determining whether to hold a declarant civilly liable for a statement that is facially true, but inferentially false [FN3]. Our concerns do not end with the protection of First Amendment rights, however, as there is also the issue of fairness. Although a published statement may be inferentially defamatory, there certainly may be instances when the context of the statement does not suggest that the declarant endorsed or intended that particular meaning (see Biro v Conde Nast, 883 F Supp 2d 441, 466-467 [SDNY 2012]), which would result in the conclusion that only the true meaning was intended or endorsed. Therefore, weighing these important and legitimate concerns, we now adopt a two-part test to determine whether the first element is met in causes of action alleging defamation by implication, requiring proof (1) that the language of the communication as a whole reasonably conveys a defamatory inference, and (2) that such language affirmatively and contextually suggests that the declarant either intended or endorsed the inference (see Stepanov v Dow Jones & Co. Inc., 120 AD3d at 37-38).
[*3]
As to the first part of the test, defendant contends that its communication did not wrongly imply that claimant was a sexual predator. We disagree. By way of background, claimant was arrested after a search warrant was issued in connection with an investigation regarding allegations that an individual, who resided with claimant, had allegedly traveled to Wisconsin to engage in sexual activity with a minor that she had met online [FN4]. On May 7, 2008, as a result of the execution of the warrant, claimant was charged with unlawful possession of marihuana, a violation, and criminal possession of a controlled substance in the seventh degree, a misdemeanor, stemming from a search of his bedroom where police officers located and confiscated marihuana and "several half full and empty bottles of what appeared to be anabolic steroids." On June 4, 2008, about two weeks before the press conference, claimant's criminal charges were adjourned in contemplation of dismissal (see CPL 170.55 [2]). Thereafter, on November 3, 2008, the criminal charges were dismissed and the records were sealed.

The communication at issue here is the press conference, which included Perez's speech to the press, a press release, a media advisory and posters displaying mug shots of those arrested during the initiative. A review of the text of Perez's speech, which was admitted into evidence at trial, described the initiative as a "three-month Internet crime fighting initiative and community outreach program." Perez also stated in his speech that the initiative had resulted in over 60 arrests for charges, including "[p]ossession and promotion of a sexual performance by a child; disseminating indecent material to a minor; computer tampering; computer trespass; unauthorized use of a computer; identity theft, and grand larceny." Perez's speech then went on to explain the community outreach portion of the initiative, which included public service announcements that were available to the media and covered topics such as "online harassment, online sexual predators, Internet safety, and password protection." Perez then went on to point out the poster boards with photographs of those individuals who were arrested during the course of the initiative. Specifically, the State Police created seven poster boards — measuring 40 inches by 32 inches — and displayed 61 mug shots. The mug shot photographs were 8 inches by 10 inches. Underneath the mug shots were small labels, with one-half-inch print on which the arrestees' names, locations and the crime or crimes for which he or she was arrested appeared. Claimant's photograph appeared in the bottom row of one of these poster boards, and, as indicated by the Court of Claims, claimant's photograph was "located directly below a mug shot of a locally known criminal arrested for child pornography." The evidence at trial revealed that the press conference was covered by five television news programs, and that two of these five showed claimant's mug shot during their broadcasts.

At trial, Perez testified that, aside from claimant, all of the individuals depicted on the poster boards were either "Internet criminals or sexual predators" and that most of the sexual crimes involved children. Perez also admitted that the labels underneath the photographs were not visible during the news broadcasts [FN5]. Joseph Donohue, who was a Technical Lieutenant in the State Police Computer Crime Unit, testified at trial that he prepared the poster boards for the press conference and explained that it was his decision to place claimant's photo on the board, despite knowing the underlying details of claimant's charges. Donohue also conceded that he and Mark Brown, a Lieutenant with the State Police, referred to the poster boards as "a wall of shame." Brown also testified at trial and explained that he executed the search warrant at claimant's home and that he was there when claimant was arrested. Brown testified that, after claimant was arrested and charged, the matter was turned over to the Albany County District Attorney's office and that he did not follow up after the arrest at all, nor did he check to see if any of the vials found in claimant's home actually contained illegal drugs. Brown also testified that he asked Donohue if he wanted to include claimant's photo on the "wall of shame" given that claimant had been arrested for a non-computer related crime; however, Donohue responded that it was about what the unit had done as a whole. Also, in emails exchanged between Brown and [*4]Donohue, wherein they discussed whether to provide street addresses for the arrestees on the labels, Brown stated that it would be easier for him and other investigators to only list the town, so as to prevent vigilantes.

Given these facts, although claimant was arrested by way of Operation Safe Internet and the communication was in and of itself true, the evidence is clear that he was not charged with any sexual offense, much less one involving children. Although we recognize that there were statements that individuals were arrested for crimes that were not sexual in nature, a review of all of the relevant materials conveys that the purpose of the communication was to apprise the public of the success of the initiative, with a focus on keeping kids safe from sexual predators online. Thus, without providing more information to the public regarding the underlying facts of claimant's case, to a reasonable viewer, the communication as a whole falsely implied that claimant, whose photograph was on the wall of shame, had engaged in a sexual crime against a child (see Martin v Daily News L.P., 121 AD3d 90, 99-100 [2014], lv denied 24 NY3d 908 [2014]). Therefore, we find that claimant has met the first part of the test and "rigorously" established that the communication "as a whole" reasonably conveyed a defamatory inference (see Stepanov v Dow Jones & Co. Inc., 120 AD3d at 37-38).

We also disagree with defendant's contention that claimant has failed to meet the second part of the test because he did not "demonstrate that the State Police intended or endorsed a misleading message about [claimant]." In making this contention, defendant conflates the "actual malice" test, which is a subjective inquiry (see Liberman v Gelstein, 80 NY2d 429, 437-438 [1992]), with the objective inquiry that must be undertaken when assessing a claim of defamation by implication (see Stepanov v Dow Jones & Co. Inc., 120 AD3d at 37). As articulated in Stepanov v Dow Jones & Co., Inc. (supra), this objective inquiry "asks whether the plain language of the communication itself suggests that an inference was intended or endorsed" (id. [emphasis added]). In making this determination, we must examine whether "the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference" (White v Fraternal Order of Police, 909 F2d 512, 520 [1990] [DC Cir 1990] [emphasis omitted]). As such, the focus is not on the declarant's mens rea or "fault" (Stepanov v Dow Jones & Co., Inc., 120 AD3d at 37) and, unlike in matters involving public figures, judging whether the inference was intended or endorsed redirects our inquiry from the mind's eye of the declarant to the very substance and "context of the [communication] as a whole" (Biro v Conde Nast, 883 F Supp 2d at 466). Thus, even if the proof indicates that the declarant's actual subjective intent is to endorse the negative innuendo, said intent is irrelevant unless the context of the actual communication manifests this intent. Likewise, even if the proof indicates that the declarant did not mean to endorse the negative innuendo, but the communication, read or viewed as a whole objectively, conveys that the publisher meant such meaning, the test is met (see Herbert v Lando, 781 F2d 298, 307 n 4 [2d Cir 1986], cert denied 476 US 1182 [1986]; Dallas Morning News, Inc. v Tatum, 554 SW3d 614, 635-636 [Tex 2018], cert denied ___ US ___, 139 S Ct 1216 [2019]).

Through this lens, we find that claimant has established that the context of defendant's communication as a whole can be reasonably read to affirmatively suggest that defendant intended or endorsed the defamatory inference that claimant was arrested for a crime involving the online sexual exploitation of a child (see Stepanov v Dow Jones & Co., Inc., 120 AD3d at 37-38). In fact, the very placement of claimant's photo in the array strongly suggested to the public that defendant intended and endorsed the message that claimant belonged on the "wall of shame" because of his fictional crime against children. Further, the use of a small, unreadable label listing the crime for which claimant was actually arrested, which was the particular manner in which the true facts were conveyed, supplied "additional, affirmative evidence suggesting that the defendant intend[ed] or endorse[d] the defamatory inference" that claimant had been arrested for a crime involving the sexual exploitation of a child (White v Fraternal Order of Police, 909 F2d at 520 [emphasis omitted]). Thus, the photo and accompanying unreadable label, which contained truthful matter, was clearly "linked together" with the negative innuendo conveyed by the communication as a whole (see Herbert v Lando, 781 F2d at 307 n 4), and is strong evidence [*5]that the defamatory inference was intended or endorsed by defendant. Accordingly, the evidence demonstrates that claimant has established the first element for his defamation cause of action by way of the two-part test (see Stepanov v Dow Jones & Co., Inc., 120 AD3d at 37-38).
We now turn to defendant's assertions regarding the remaining elements of claimant's cause of action — that claimant failed to establish that defendant acted in a grossly irresponsible manner and that defendant is immune from liability due to qualified privilege, both of which require a subjective analysis. "Where the plaintiff is a private person, but the content of the [communication] is arguably within the sphere of legitimate public concern, the publisher of the alleged defamatory statements cannot be held liable unless it 'acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties'" (Stone v Bloomberg L.P., 163 AD3d 1028, 1029 [2018], quoting Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199 [1975]). Given that the press conference pertained to Internet crimes and the protection of children from sexual predators, defendant was grossly irresponsible in failing to adequately label the photographs and properly inform the public and the media that claimant was not arrested for a sex crime but for possession of drugs (compare Reddy v WSYR NewsChannel 9, 166 AD3d 1517, 1517-1518 [2018]). Additionally, the failure of both Donohue and Perez to confirm the status of claimant's drug charges, most importantly that the charges had been adjourned in contemplation of dismissal, before publishing his photo in the press conference is further evidence of defendant's gross irresponsibility (compare Thomas v Journal Register Co., 24 AD3d 988, 990 [2005]).

Likewise, we do not find defendant immune from liability due to qualified privilege. Qualified privilege attaches "when a person makes a good-faith, bona fide communication upon a subject which he or she has an interest, or a legal, moral or societal interest to speak, and the communication is made to a person with a corresponding interest" (Mughetti v Makowski, 162 AD3d 1444, 1445-1446 [2018] [internal quotation marks and citations omitted]; see Stega v New York Downtown Hosp., 31 NY3d 661, 669-670 [2018]). Such privilege does not "provide the communicant with an immunity against the imposition of liability," but instead shifts the burden of proof to the plaintiff to establish malice (Toker v Pollak, 44 NY2d 211, 219 [1978]; see Mughetti v Makowski, 162 AD3d at 1446). "Malice includes spite, ill will, knowledge that the statements are false or reckless disregard as to whether they are false" (Mughetti v Makowski, 162 AD3d at 1446 [internal quotation marks and citations omitted]; see Stega v New York Downtown Hosp., 31 NY3d at 670). Moreover, it is sufficient for the plaintiff/claimant to demonstrate that the defendant "was at least on notice of the lack of a factual basis [of the communication], such that it should have been alerted to the need to make some further attempt to verify its claims prior to publication" (Mahoney v State of New York, 236 AD2d 37, 40-41 [1997]; see James v Gannett Co., 40 NY2d 415,424 [1976]).

Although we agree with defendant that qualified privilege attached to the communication, we find that claimant met his shifted burden and established that defendant acted with reckless disregard and, therefore, with malice (see Mughetti v Makowski, 162 AD3d at 1446; Mahoney v State of New York, 236 AD2d at 41 n 2). Considering that both Donohue and Brown were aware that claimant was not charged with a sexual offense, that they controlled the content and delivery of the press conference and Donohue's reference to the poster board as a "wall of shame," the record establishes a "reckless disregard of whether [the assertion] was false or not" (Liberman v Gelstein, 80 NY2d 429, 438 [1992] [internal quotation marks and citation omitted]), thereby supporting a finding of malice (compare Foster v Churchill, 87 NY2d 744, 752 [1996]). Further, their concern about the communication inciting vigilantism and their failure to take any action only further highlights their recklessness. Accordingly, the Court of Claims properly found that claimant met his shifted burden and, as such, properly found defendant liable for defamation.

 Finally, with respect to claimant's cross appeal, we find no basis upon which to disturb the Court of Claims' damages award. "While the amount of damages to be awarded for personal injuries is a question for the trier of fact, and the trier of fact's determination is entitled to great deference, it may be set aside if the award deviates materially from what would be reasonable compensation" (Davis v State of New York, 148 AD3d 985, 986 [2017] [internal quotation [*6]marks, brackets and citations omitted]; cf. Martin v State of New York, 39 AD3d 905, 908 [2007], lv denied 9 NY3d 804 [2007]). Although instructive, "prior damages awards in cases involving similar injuries are not binding upon the courts" (Estate of Loughlin v State of New York, 146 AD3d 863, 864 [2017] [internal quotation marks and citations omitted]). Here, the evidence elicited at trial established that defendant's actions wrongfully branded claimant as a sexual predator, which is one of the most "loathsome labels" in society (Rossignol v Silvernail, 185 AD2d 497, 499-500 [1992], lv denied 80 NY2d 760 [1992]). Because of this, claimant withdrew from family and friends, and there is evidence that he exhibited heightened anxiety due to the stigma caused by the press conference. There is also ample evidence in the record that claimant suffered from a traumatic brain injury, which he sustained during a previous vehicular accident, and it is undeniable that this condition made claimant more susceptible to psychological injury following the press conference. In assessing damages, the Court of Claims considered case law where the alleged conduct exacerbated a preexisting condition (see e.g. Bartolone v Jeckovich, 103 AD2d 632, 634-635 [1984]; AA v State of New York, 43 Misc 2d 1004, 1014 [Ct Cl 1964]), and in fact explicitly stated that the award of damages factored in the "aggravation and exacerbation of [claimant's] preexisting medical condition." Therefore, considering all of the circumstances, including the emotional and psychological injury sustained by claimant as a result of the acts of the State Police, we find that the award of $300,000 does not deviate materially from what is reasonable compensation and, as such, we decline to disturb it (see Kinge v State of New York, 79 AD3d 1473, 1481 [2010]); compare Yammine v DeVita, 43 AD3d 520, 522 [2007]; Dobies v Brefka, 45 AD3d 999, 1000 [2007]; Rossignol v Silvernail, 185 AD2d at 499-500).
Egan Jr., J.P., Lynch, Clark and Devine, JJ., concur.
ORDERED that the appeal and cross appeals from the decisions are dismissed, without costs.
ORDERED that the judgment is affirmed, without costs.



Footnotes

Footnote 1: The appeal and cross appeals from the decisions entered October 25, 2013 and July 18, 2017 must be dismissed, as a decision is not an appealable paper (see CPLR 5512 [a]; Casey v State of New York, 148 AD3d 1370, 1372 n 2 [2017]). However, the cross appeals from the judgment bring up for review said decisions (see Casey v State of New York, 148 AD3d at 1372 n 2).

Footnote 2: Claimant concedes in his brief that defamation by implication is the applicable theory in this instance.

Footnote 3: This standard has also been adopted by numerous federal courts (see e.g. Kavanaugh v Zwilling, 578 Fed Appx 24, 24-25 [2d Cir 2014]; Kendall v Daily News Publ. Co., 716 F3d 82, 91 [3d Cir 2013]; Compuware Corp. v Moody's Invs. Servs., Inc., 499 F3d 520, 528 [6th Cir 2007]; Howard v Antilla, 294 F3d 244, 252 [1st Cir 2002]; Saenz v Playboy Enters. Inc., 841 F2d 1309, 1317-1318 [7th Cir 1988]).

Footnote 4: Because this investigation and search warrant stemmed from allegations involving the sexual exploitation of a minor on the Internet, it fell under the purview of Operation Safe Internet.

Footnote 5: The label under claimant's photograph lists his crime as "CPCS7th (steroids)."