[62 NYS3d 372]

Maurice R. Greenberg, Respondent-Appellant, v Eliot L. Spitzer, Appellant-Respondent.

Second Department, September 13, 2017

28

## APPEARANCES OF COUNSEL

*Levine Sullivan Koch & Schulz, LLP*, New York City (*Jay Ward Brown* of counsel), for appellant-respondent.

*Boies, Schiller & Flexner LLP*, Armonk (*David Boies, Nicholas A. Gravante, Jr., Robert J. Dwyer* and *Amy L. Neuhardt* of counsel), for respondent-appellant.

## OPINION OF THE COURT

CHAMBERS, J.

This appeal presents an opportunity to discuss in some detail the proper application of CPLR 3211 (a) (1) and (7) in the context of an action sounding in defamation.

## I. Background

The plaintiff, Maurice R. Greenberg, is the former chairman and chief executive officer of American International Group, Inc. (hereinafter AIG), and the defendant, Eliot L. Spitzer, is the former Attorney General of the State of New York (hereinafter the NYAG).

In May 2005, Spitzer, who was then the NYAG, brought a lawsuit against Greenberg under General Business Law article 23-A (the Martin Act), alleging, among other things, that Greenberg initiated at least two sham reinsurance transactions with General Reinsurance Corporation, Inc. (hereinafter the GenRe transactions), which misled the investing public as to AIG's true financial condition. The case arose following Spitzer's announcement, in October 2004, of a wide-ranging investigation into fraud and anti-competitive practices in the insurance industry. During the same time period, AIG was embroiled in a series of lawsuits brought against it by the United States Securities and Exchange Commission (hereinafter the SEC), the United States Department of Justice (hereinafter the DOJ), and the Office of the NYAG.

On July 13, 2012, Spitzer (who was no longer in public office at the time) appeared on the CNBC television program "The Closing Bell" with program anchor Maria Bartiromo (hereinaf-

ter the July 13 interview) to respond to comments made by Dennis Vacco, who had preceded Spitzer as the NYAG. Vacco had appeared on the same program a few days earlier and had stated that during a meeting with Spitzer in September 2004, Spitzer made a "startling personal attack" on Greenberg, which left Vacco "with an uneasy feeling that there was some personal animus that was driving him."

During the July 13 interview, Spitzer made several statements concerning Greenberg's role in the GenRe transactions, as well as the circumstances surrounding the termination of his tenure as chairman and chief executive officer of AIG.

On July 16, 2012, Spitzer appeared on his own program, "Viewpoint" on Current TV (hereinafter the Viewpoint appearance), during which he re-aired several portions of the July 13 interview. Approximately one year later, a book written by Spitzer entitled Protecting Capitalism Case by Case (hereinafter Protecting Capitalism) was published.

At the time of Spitzer's two television appearances and the publication of Protecting Capitalism, the NYAG's action against Greenberg with respect to the GenRe transactions remained pending and undecided (see People v Greenberg, 21 NY3d 439 [2013]; People v Greenberg, 127 AD3d 529 [2015]).

On July 12, 2013, Greenberg commenced this defamation action against Spitzer based on various statements he made during the July 13 interview and the Viewpoint appearance, as well as in Protecting Capitalism. Spitzer subsequently moved to dismiss the amended complaint pursuant to CPLR 3211 (a) (1) and (7) on the grounds that the challenged statements were substantially true, privileged under Civil Rights Law § 74 as fair and true reports of judicial proceedings, or otherwise nonactionable. He also argued that the amended complaint failed to sufficiently plead actual malice.

In an order dated June 24, 2014, the Supreme Court granted the motion in part and denied it in part. Spitzer appeals from so much of the order as denied certain branches of his motion, and Greenberg cross-appeals from so much of the same order as granted the remaining branches of Spitzer's motion.

Statements at Issue

The alleged defamatory statements are reproduced below exactly as they appear in the amended complaint (including bolded language), except for statement number 3.1, which is reproduced from Protecting Capitalism.

## 1. July 13 Interview

1.1 " 'Maria, wait a minute. **Let's deal with the facts for a minute**. We brought a charge that AIG's accounting was fundamentally fraudulent. The company admitted that, the Justice Department, the SEC joined us in those charges. **The company's board removed Hank Greenberg**. Because of what the silliness that is attached to this claim, people are saying I did this out of personal invective or somehow personal animosity attacks. Can I tell you something very simple, and I don't know if this will make Hank feel better or not. I have no emotions about him one way or the other. He is merely one in a litany, Maria, **he is one in a litany of corporate executives who defrauded the market**. We prosecuted them, the charge against the prosecutor that a prosecutor's motive is flawed is the last refuge of the guilty. I've had this claim made against me by every person we prosecuted' " (amended complaint ¶ 20 [hereinafter Statement 1.1]).

1.2 " 'Maria, Maria, there are people who still think that the moon, that the sun revolves around the earth. **You know, let's deal with reality here. Hank Greenberg's accounting was fraudulent**' " (amended complaint ¶ 21 [hereinafter Statement 1.2]).

1.3 " 'Maria, look, I hate to say this to you, **deal with facts and reality**, not what Hank Greenberg's PR machine wants you to believe. **Hank Greenberg was thrown out by his own board**. His company paid 1.6 billion dollars in a settlement, **acknowledged his accounting was fraudulent**. These are facts, **read the Federal Judicial Opinions. He was the one who instigated the conspiracy**' " (amended complaint ¶ 22 [hereinafter Statement 1.3]).

1.4 "Eliot Spitzer: No, no Maria. Unfortunately, I have in front of me the transcript of what I said on Sunday morning TV, with George Stephanopoulos.

"Maria Bartiromo: ya, ya . . .

"Eliot Spitzer: Here's the transcript:

" 'Deals were fundamentally flawed. The evidence is overwhelming that these were transactions created for the purpose of deceiving the market. **We call that fraud, it's deceptive, it's wrong, it's illegal. That company was a black box run with an iron fist by a CEO who did not tell the public the truth.**'

**"Every piece of that statement was accurate, and has been proven**" (amended complaint ¶ 24 [hereinafter Statement 1.4]).

1.5 "Eliot Spitzer: Maria, Maria, **here is the federal court opinion**. Do you want to read it. **Twenty-nine pages. Hank Greenberg co-conspirator in fraud. Facts matter**, Maria. I know that this is cable TV, but **facts matter**.

"Maria Bartiromo: I'm aware facts matter.

"Eliot Spitzer: Maria, you need to understand, **AIG was being led by a CEO whose accounting was fraudulent. That's why the board removed him. He paid a fine of 1.6 billion dollars**" (amended complaint ¶ 26 [hereinafter Statement 1.5]).

1.6 " '**Hank Greenberg at AIG committed fraud. The record on that is indisputable**' " (amended complaint ¶ 27 [hereinafter Statement 1.6]).

1.7 "Defendant Spitzer repeatedly and falsely asserted that a federal judge has found that Mr. Greenberg 'is a conspirator whose actions began the conspiracy' " (amended complaint ¶ 29 [hereinafter Statement 1.7]).

2. Viewpoint Appearance

2.1 "In the Viewpoint Appearance, Defendant Spitzer re-aired several portions of the July 13 Interview which included portions of the July 13 Defamatory Statements" (amended complaint ¶ 35 [hereinafter Statement 2.1]).

2.2 " 'Every statement I have made about Hank Greenberg's role in these frauds has been proven true and accurate' " (amended complaint ¶ 36 [hereinafter Statement 2.2]).

## 3. Protecting Capitalism

3.1 "I have avoided writing in this book about the ongoing litigation against Hank Greenberg, the former CEO of AIG. Because the case is still pending, I think it better that I limit my comments. That notwithstanding, several points must be made, given the constant effort to rewrite history. (It might be worth looking at my appearance on CNBC with Maria Bartiromo on July 13, 2012.)

"Here are a few salient and irrefutable points.

"1. AIG and Hank Greenberg were charged by the New York Attorney General's office—when I was Attorney General—with **civil fraud** and deceptive accounting practices, as well as a **raft of other abuses**;

"2. AIG settled those charges for $1.64 billion, at the time the largest payment in history. *The New York Times* reported the settlement as follows:

" 'Under the settlement reached with the Justice Department, the Securities and Exchange Commission, the New York attorney general's office, and the New York State Insurance Department, **A.I.G. acknowledged that it had deceived the investing public and regulators**.'

"3. Further from *The Times*:

" 'Mr. Greenberg, who was removed by A.I.G.'s board last March, remains under investigation by the Securities and Exchange Commission and the Justice Department and faces a lawsuit by the New York attorney general, Eliot Spitzer.'

"4. A quote from a Bloomberg News report about **the removal of Greenberg by the board**:

" 'Last night, AIG announced that Greenberg, 79, would step down as chief executive officer. . . . Greenberg's resignation as CEO came as New York Attorney General Eliot Spitzer zeroed in on a specific reinsurance transaction between AIG and Berkshire Hathaway Inc.'s General Reinsurance subsidiary. . . . Spitzer obtained information in the

past 10 to 14 days that **Greenberg himself may have initiated the transaction . . .** '

"5. **Lest there be ANY doubt about the veracity of this claim of Greenberg's role**, here is a quote from a federal judge's written opinion after a federal criminal prosecution that focused on these very transactions:

" 'The government presented sufficient evidence that, **starting with Greenberg's October 31 2000 phone call to Ferguson, there was an agreement to carry out a transaction to artificially inflate AIG's loss reserves and deceive investors** about the amount of the company's loss reserves and quality of earnings.' More from the federal judge: 'The evidence provides an adequate basis for a rational jury to conclude that **the conspiracy to artificially inflate AIG's loss reserves and deceive the company's investors started with Greenberg's call to Ferguson on October 31, 2000.**'

"6. Perhaps that is why **Greenberg invoked his Fifth Amendment right to avoid answering questions** when we invited him to explain these transactions.

"7. And perhaps that is why after the SEC **and the Justice Department charged him** in 2009 for the actions relating to these same transactions; he settled for $15 million.

"8. Greenberg was deemed to be an unindicted co-conspirator by federal prosecutors, **invoked his Fifth Amendment right to avoid answering questions**, and was **removed by his own board of directors** after the accounting at AIG was deemed to be unreliable. **Our case against him was rock solid**" (Eliot Spitzer, Protecting Capitalism Case by Case 169-170 n 9 [2013] [emphasis added by Greenberg in amended complaint ¶¶ 46, 47, 48, 49, 50, and 51] [hereinafter Statement 3.1]).

3.2 " 'The desire to be a monopolist runs deep— whether for **organized crime families** or "traditional" businesses. Competition, after all, is a seri-

ous impediment to profit margins. **So it was with Marsh & McLennan**, the world's biggest insurance broker, and its desire to dominate the insurance industry.'

" 'Marsh at the time had as its CEO **Jeff Greenberg**—the son of **Hank Greenberg**, the now former but then still reigning CEO of AIG. Jeff, who had worked at AIG for a time, seemed intent while at Marsh on proving that he too could become a corporate titan.

" 'Often during the period I was Attorney General **I would analogize the behavior of the organized crime families to the behavior of some of our major companies**. Needless to say, a lot of people got bent out of shape by that. But there was a reason I made the analogy. As I said above, **the organized crime families learned about monopoly power from the history of the oil and other trusts, and traditional businesses learned the power of monopoly the same way**. They all decided that the best way to extract profits and ensure a lack of competition was collusion, not competition. **Marsh exemplified this**.'

" 'But just as the **Gambinos and the other organized crime families** divided up the trucking market to ensure there would be no competition, **so too did Marsh** arrange the market so it could make bigger fees' " (amended complaint ¶ 52 [hereinafter Statement 3.2]).

3.3 " 'The first failure that contributed to [Richard] Grasso's overcompensation was the selection and composition of the NYSE's board of directors and compensation committee. The majority of directors and almost all members of the compensation committee during Grasso's tenure as CEO were subject to regulation and oversight by the NYSE and either they or their firms could be rewarded or punished by Grasso.

" 'Indeed, during Grasso's tenure as chairman and CEO of the NYSE, o**nly a small minority of directors was independent of Grasso, and an even smaller fraction of the compensation committee was independent**.

" 'Put another way, almost all of the members of the committee responsible for Grasso's compensation had a personal stake in remaining in the good graces of the NYSE's chairman and CEO.

" **'In 2001, the year Grasso was awarded more than $30 million, there were exactly zero independent directors on the compensation committee**:

| 2001 NYSE COMPENSATION COMMITTEE | INTEREST |
| --- | --- |
| Kenneth Langone— Chair | Securities Firm (Invemed) |
| Richard S. Fuld | Securities Firm (Lehman Brothers) |
| **Maurice Greenberg** | **Listed Company (AIG)** |
| Mel Karmazin | List Company (Viacom) |
| David Komansky | Securities Firm (Merrill Lynch) |
| Gerald Levin | Listed Company (Time Warner) |
| Robert M. Murphy | Specialist Firm (LaBranche & Co.) |
| Alex Trotman | Listed Company (Ford) |

" 'The composition of the board and the compensation committee did not occur by chance. In another failure of corporate governance, Grasso exerted significant influence over who was elected to the NYSE's board of directors and hand-picked the committees on which directors served. This allowed Grasso to stack the compensation committee with directors who were more likely to approve excessive pay packages, either because of his influence over them or because of a shared interest in ever-rising CEO compensation' " (amended complaint ¶ 53 [hereinafter Statement 3.3]).

3.4 " 'Even listed companies could be helped or harmed by the influence Grasso held over the specialist responsible for the company's stock.

" 'For example, in 2001, **Maurice Greenberg**, who was the chairman and CEO of AIG and a member of the NYSE's compensation committee, **called Grasso to complain that the specialist in AIG stock was not doing enough to keep the stock price high. Grasso dutifully relayed Greenberg's concerns to the specialist** in question, **creating pressure to prop up the stock price'** " (amended complaint ¶ 54 [hereinafter Statement 3.4]).

## II. Applicable Principles of Law

The law of defamation, which has its roots in the common law (*see Gross v New York Times Co.*, 82 NY2d 146, 152 [1993]), has long been overarched by constitutional rules founded upon the conviction "that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection" (*United States v Associated Press*, 52 F Supp 362, 372 [SD NY 1943], *affd* 326 US 1 [1945]). Grounded in the First and Fourteenth Amendments to the United States Constitution, these rules "place significant restrictions on the ability of the States to fashion remedies for harm caused by defamatory publications, to ensure that fear of liability will not chill important free speech and free press rights and cause self-censorship" (*Mahoney v Adirondack Publ. Co.*, 71 NY2d 31, 38 [1987]).

The basic principles of law relevant to the issues raised in this appeal are set out below.

## Elements of Defamation

The elements of a cause of action for defamation are (a) a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion, or disgrace, (b) published without privilege or authorization to a third party, (c) amounting to fault as judged by, at a minimum, a negligence standard, and (d) either causing special harm or constituting defamation per se (*see Rosner v Amazon.com*, 132 AD3d 835, 836-837 [2015]; *Kamchi v Weissman*, 125 AD3d 142, 156 [2014]; *see also Davis v Boeheim*, 24 NY3d 262, 268 [2014]). In addition, where, as here, the plaintiff is a public figure, the plaintiff is required to prove, by clear and convincing evidence, that the defamatory statements were published with actual malice (*see Mahoney v Adirondack Publ. Co.*, 71 NY2d at 39).

"Truth is an absolute defense to an action based on defamation" (*Heins v Board of Trustees of Inc. Vil. of Greenport*, 237 AD2d 570, 571 [1997]; *see Goldberg v Levine*, 97 AD3d 725, 726 [2012]). The test to determine whether a statement is substantially true "is whether [the statement] as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced" (*Fleckenstein v Friedman*, 266 NY 19, 23 [1934]; *see Franklin v Daily Holdings, Inc.*, 135 AD3d 87, 94 [2015]).

## Statements of Fact Versus Opinions

"Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, 'it fol-

lows that only statements alleging facts can properly be the subject of a defamation action' " (*Gross v New York Times Co.*, 82 NY2d at 152-153, quoting *600 W. 115th St. Corp. v Von Gutfeld*, 80 NY2d 130, 139 [1992]; *see Davis v Boeheim*, 24 NY3d at 268). Thus, "[a]n expression of pure opinion is not actionable, . . . no matter how vituperative or unreasonable it may be" (*Steinhilber v Alphonse*, 68 NY2d 283, 289 [1986]).

> "A pure opinion may take one of two forms. It may be a statement of opinion which is accompanied by a recitation of the facts upon which it is based, or it may be [a]n opinion not accompanied by such a factual recitation so long as it does not imply that it is based upon undisclosed facts" (*Davis v Boeheim*, 24 NY3d at 269 [internal quotation marks omitted]).

Conversely, "an opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, is a mixed opinion and is actionable" (*id.* [ellipsis and internal quotation marks omitted]).

"Whether a particular statement constitutes an opinion or an objective fact is a question of law" (*Mann v Abel*, 10 NY3d 271, 276 [2008]; *see Kamchi v Weissman*, 125 AD3d at 157; *Abakporo v Daily News*, 102 AD3d 815, 816 [2013]).

> "In distinguishing between facts and opinion, the factors the court must consider are (1) whether the specific language has a precise meaning that is readily understood, (2) whether the statements are capable of being proven true or false, and (3) whether the context in which the statement appears signals to readers [or listeners] that the statement is likely to be opinion, not fact" (*Silverman v Daily News, L.P.*, 129 AD3d 1054, 1055 [2015]; *see Mann v Abel*, 10 NY3d at 276; *Steinhilber v Alphonse*, 68 NY2d at 292).

"The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion" (*Steinhilber v Alphonse*, 68 NY2d at 290).

Civil Rights Law § 74

The privilege afforded by Civil Rights Law § 74 is an affirmative defense to a claim of defamation (*see Saleh v New York Post*, 78 AD3d 1149, 1151 [2010]). "Civil Rights Law § 74 states

that, '[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding,' and the privilege applies to reports about legal pleadings" (*Martin v Daily News L.P.*, 121 AD3d 90, 100 [2014], quoting Civil Rights Law § 74). It is incumbent on the party asserting the privilege "to establish that the statements at issue reported on a judicial proceeding" (*Cholowsky v Civiletti*, 69 AD3d 110, 114 [2009] [internal quotation marks omitted]). Thus, "[i]f the context in which the statements are made make it impossible for the ordinary viewer [listener or reader] to determine whether defendant was reporting on a judicial proceeding, the absolute privilege does not apply" (*Cholowsky v Civiletti*, 69 AD3d at 114-115 [internal quotation marks omitted]).

"When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision" (*Holy Spirit Assn. for Unification of World Christianity v New York Times Co.*, 49 NY2d 63, 68 [1979]; *see Alf v Buffalo News, Inc.*, 21 NY3d 988, 990 [2013]). Rather, the relevant inquiry is whether the article "provided substantially accurate reporting" (*Alf v Buffalo News, Inc.*, 21 NY3d at 990; *see Saleh v New York Post*, 78 AD3d at 1151). "Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within section 74's privilege" (*Lacher v Engel*, 33 AD3d 10, 17 [2006]; *see Saleh v New York Post*, 78 AD3d at 1152).

## III. Standard of Review

Although the general principles relating to CPLR 3211 (a) (1) and (7) are uncontroversial, their application in the context of an action sounding in defamation is disputed by the parties. At the outset, a brief review of the relevant principles is in order.

"In assessing the adequacy of a complaint under CPLR 3211 (a) (7), the court must give the pleading a liberal construction, accept the facts alleged in the complaint to be true and afford the plaintiff 'the benefit of every possible favorable inference'" (*Kamchi v Weissman*, 125 AD3d at 150, quoting *J.P. Morgan Sec. Inc. v Vigilant Ins. Co.*, 21 NY3d 324, 334 [2013]; *see Leon v Martinez*, 84 NY2d 83, 87-88 [1994]; *Rosner v Amazon.com*, 132 AD3d at 836). "Unlike on a motion for summary judgment where the court searches the record and assesses the sufficiency of the parties' evidence, on a motion to dismiss the court merely examines the adequacy of the pleadings" (*Davis v Boeheim*, 24 NY3d at 268 [internal quotation marks omitted]).

"A court is, of course, permitted to consider evidentiary material submitted by a defendant in support of a motion to dismiss pursuant to CPLR 3211 (a) (7)" (*Sokol v Leader*, 74 AD3d 1180, 1181 [2010]).

> "When evidentiary material is considered, the criterion is whether the proponent of the pleading has a cause of action, not whether he [or she] has stated one, and, unless it has been shown that a material fact as claimed by the pleader to be one is not a fact at all and unless it can be said that no significant dispute exists regarding it, again dismissal should not eventuate" (*Guggenheimer v Ginzburg*, 43 NY2d 268, 275 [1977]; *see Sokol v Leader*, 74 AD3d at 1181-1182).

"A motion to dismiss pursuant to CPLR 3211 (a) (1) will be granted only if the 'documentary evidence resolves all factual issues as a matter of law, and conclusively disposes of the plaintiff's claim' " (*Fontanetta v John Doe 1*, 73 AD3d 78, 83-84 [2010], quoting *Fortis Fin. Servs. v Fimat Futures USA*, 290 AD2d 383, 383 [2002]).

In an action to recover damages for defamation, "[t]he issue of whether particular words are defamatory presents a legal issue to be resolved by the court" (*Brach v Congregation Yetev Lev D'Satmar*, 265 AD2d 360, 361 [1999]; *see Aronson v Wiersma*, 65 NY2d 592, 593 [1985]). Thus, this type of action lends itself well to analysis under CPLR 3211 (a) (1) and (7).

Here, the parties disagree as to what properly constitutes "documentary evidence" within the ambit of CPLR 3211 (a) (1). As this Court has observed, " 'documentary evidence' is a 'fuzzy' term, and what is documentary evidence for one purpose might not be documentary evidence for another" (*Fontanetta v John Doe 1*, 73 AD3d at 84).

In an action to recover damages for defamation, documentary evidence can serve a number of different purposes. First, where the complaint itself does not attach as an exhibit, or otherwise incorporate by reference, a full copy, transcript, printout, or video of the relevant medium in which the allegedly defamatory statement is contained, the defendant may submit such copy, transcript, printout, or video (as the case may be) to aid the court in determining whether the complaint states a cause of action (*cf. Condit v Dunne*, 317 F Supp 2d 344, 357 [SD NY 2004] [applying Fed Rules Civ Pro rule 12 (b) (6)]). Whether such material is deemed "documentary evidence" within the

meaning of CPLR 3211 (a) (1) or evidentiary material otherwise properly considered on a motion pursuant to CPLR 3211 (a) (7) (*see Guggenheimer v Ginzburg*, 43 NY2d at 275) is of little practical consequence. The point is that such material is *not* offered for the truth of its contents, but solely for the purpose of establishing the *context* in which the allegedly defamatory statement was made—an inquiry that bears directly on whether the statement is actionable as a matter of law (*see Mann v Abel*, 10 NY3d at 276; *Brian v Richardson*, 87 NY2d 46, 51 [1995]).

■ Thus, the full copy of Protecting Capitalism, as well as the full transcripts of the July 13 interview and the Viewpoint appearance, along with the accompanying DVDs, all of which were submitted by Spitzer in support of his motion, must be considered in determining whether the alleged defamatory statements are actionable as a matter of law (*see Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 254 [1991]; *Silsdorf v Levine*, 59 NY2d 8, 13 [1983]).

■ Second, insofar as Spitzer invokes the absolute privilege afforded to "a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding" (Civil Rights Law § 74), "documentary evidence" within the meaning of CPLR 3211 (a) (1) may be offered for such purpose (*see e.g. Saleh v New York Post*, 78 AD3d at 1152; *Sokol v Leader*, 74 AD3d at 1182-1183; *Cholowsky v Civiletti*, 69 AD3d 110 [2009]). In this context, the "documentary evidence" may include, without limitation, a transcript of the relevant court proceeding or copy of the relevant judicial opinion. Here again, the documentary evidence is not offered for the truth of its contents, but merely as proof of the underlying proceeding giving rise to the privilege, for the specific purpose of determining whether the alleged defamatory statement constitutes a "fair and true" report of such proceeding (Civil Rights Law § 74).

■ Third, inasmuch as truth is an absolute defense to an action based on defamation, "documentary evidence" may also be offered to establish that the allegedly defamatory statement is substantially true (*see Goldberg v Levine*, 97 AD3d at 726). In this context, however, if the "documentary evidence" is submitted specifically to establish the truth of its contents, it must be of such nature and reliability as to be "essentially undeniable" (*Fontanetta v John Doe 1*, 73 AD3d at 84-85), and must "utterly refute[ ]" (*Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 326 [2002]) the plaintiff's factual allegation that the alleg-

edly defamatory statement is false. This is an exacting standard, which is not easily met at the pre-answer stage (*see e.g. Colantonio v Mercy Med. Ctr.*, 115 AD3d 902, 903-904 [2014]; *Matovcik v Times Beacon Record Newspapers*, 46 AD3d 636, 638 [2007]).

Guided by the above principles, we now turn to the merits of Spitzer's motion to dismiss.

## IV. Discussion

Rather than considering each of the subject defamatory statements separately, the parties themselves, as well as the Supreme Court, have classified them into eight broad categories, as follows: (1) the "Removal Statements" asserting that Greenberg was "removed" or "thrown out" by his own board (*see* Statements 1.1, 1.3, 1.5, 3.1); (2) the "Co-Conspirator Statements" asserting that Greenberg "instigated the conspiracy" or was a "co-conspirator" (*see* Statements 1.3, 1.5, 1.7, 3.1); (3) the "Fifth Amendment Privilege Statement" asserting that Greenberg "invoked his Fifth Amendment right to avoid answering questions" (*see* Statement 3.1); (4) the "Paid Fine Statement" asserting that Greenberg "paid a fine of $1.6 billion dollars" (*see* Statement 1.5); (5) the "DOJ Charges Statement" asserting that the "Justice Department" charged Greenberg in connection with the GenRe transactions (*see* Statement 3.1); (6) the "Organized Crime Statement" comparing the behavior of Marsh & McLennan to the behavior of "organized crime families" (*see* Statement 3.2); (7) the "NYSE Board of Directors Statements" asserting that Greenberg and other directors of the NYSE breached corporate governance rules and failed to independently perform their duties (*see* Statement 3.3) and that Richard Grasso assisted Greenberg in efforts to "prop up" AIG's stock price (*see* Statement 3.4); and (8) the "Fraudulent Accounting Statements" asserting that Greenberg engaged in fraud (*see* Statements 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 2.2) and was "charged" with, inter alia, "civil fraud" (*see* Statement 3.1).

While the above classification has the advantage of avoiding repetition, it also carries the risk of sacrificing contextual analysis for the sake of expediency. For instance (as will be more fully discussed below), the statement made by Spitzer during the July 13 interview that "Hank Greenberg at AIG committed fraud" (Statement 1.6 [emphasis omitted]) is factually distinct from the statement later made in Protecting Capitalism that "Hank Greenberg [was] charged by the [NYAG]'s office . . .

with civil fraud and deceptive accounting practices" (Statement 3.1 [emphasis omitted]), even though both statements are bundled together within the "Fraudulent Accounting Statements" category. For this reason, rather than strictly following the Supreme Court's analysis by class or category, we choose instead to analyze the statements by category, but within the context in which each statement was made.

July 13 Interview (Statements 1.1 through 1.7)

Statements 1.1 through 1.7 contain several allegedly defamatory statements.

Fraudulent Accounting Statements. As regards the Fraudulent Accounting Statements made during the July 13 interview (*see* amended complaint ¶¶ 20-22, 24, 26-27), we find, preliminarily, that such statements are actionable. Indeed, "[w]ords which affect a person in his or her profession by imputing to him or her any kind of fraud, dishonesty, misconduct, or unfitness in conducting one's profession may be actionable" (*Wasserman v Haller*, 216 AD2d 289, 289 [1995]). The Fraudulent Accounting Statements made by Spitzer during the July 13 interview meet this threshold requirement. Moreover, these statements have a precise meaning that is readily understood, and are capable of being proven true or false (*see Mann v Abel*, 10 NY3d at 276; *Steinhilber v Alphonse*, 68 NY2d at 292). When considered in the context of the entire communication and of the circumstances in which they were spoken, the statements may be reasonably understood as assertions of provable fact about Greenberg (*see Gross v New York Times Co.*, 82 NY2d at 152-153).

Having thus concluded that the Fraudulent Accounting Statements made during the July 13 interview are actionable, we must go on to consider whether they are substantially true or privileged under Civil Rights Law § 74, as Spitzer contends. Based on the documentary evidence before it, the Supreme Court properly determined that Spitzer failed to show that the statements were either substantially true (*see International Shoppes, Inc. v Spencer*, 34 AD3d 429, 430 [2006]) or privileged pursuant to Civil Rights Law § 74 (*see Rivera v Greenberg*, 243 AD2d 697, 698 [1997]).

█ Specifically, the documentary evidence, which included a copy of the NYAG's May 26, 2005 complaint against Greenberg and others, established only that Greenberg was *charged* with fraud based, inter alia, on his personal participation in the GenRe transactions. Moreover, we note that the Court of

Appeals, upon reviewing the evidence against Greenberg on a motion for summary judgment, determined only that "there [was] evidence sufficient for trial that . . . Greenberg . . . participated in a fraud" (*People v Greenberg*, 21 NY3d at 447). However, the statements made by Spitzer during the July 13 interview went beyond stating that fraud charges were pending against Greenberg, or even opining on the perceived strength of the NYAG's case against Greenberg. Rather, Spitzer's language reasonably implied that the fraud charges against Greenberg had already been established (*see e.g.* Statement 1.6 ["Hank Greenberg at AIG committed fraud. The record on that is indisputable" (emphasis omitted)]). In fact, Spitzer's background as the former NYAG who spearheaded the investigation into AIG's accounting practices and initiated the civil lawsuit against Greenberg in 2005 may well have caused listeners to be less skeptical and more willing to conclude that Spitzer was asserting or implying facts about Greenberg that were proffered for their accuracy, rather than merely expressing an opinion about the strength of the case (*see Davis v Boeheim*, 24 NY3d at 273). Under these circumstances, the Supreme Court properly determined that the amended complaint sufficiently stated a cause of action for defamation based on the Fraudulent Accounting Statements made during the July 13 interview.

▌Removal Statements. As regards the Removal Statements made during the July 13 interview, in which Spitzer asserted that "[t]he company's board removed Hank Greenberg" (amended complaint ¶ 20 [emphasis omitted]), "Hank Greenberg was thrown out by his own board" (amended complaint ¶ 22 [emphasis omitted]), and "AIG was being led by a CEO whose accounting was fraudulent. That's why the board removed him" (amended complaint ¶ 26 [emphasis omitted]), we conclude that these statements, when considered in the context in which they were made, are actionable.

"The mere fact of one's removal from office carries no imputation of dishonesty or lack of professional capacity. It is only when the publication contains an insinuation that the dismissal was for some misconduct that it becomes defamatory" (*Nichols v Item Publs.*, 309 NY 596, 601 [1956] [citations omitted]; *see Chang v Fa-Yun*, 265 AD2d 265 [1999]). Here, the allegedly defamatory statements were made side by side with statements that Greenberg engaged in fraud. In fact, one of the three statements claimed not only that Greenberg had been

removed by his board of directors, but that the reason for his removal was because his "accounting was fraudulent." This is sufficient to make the statements actionable (*see Carney v Memorial Hosp. & Nursing Home of Greene County*, 64 NY2d 770, 772 [1985] [statement that plaintiff was discharged "for cause" is susceptible of a defamatory meaning inasmuch as it connotes dishonesty or lack of professional competence]).

Moreover, contrary to the Supreme Court's determination, the documentary evidence submitted by Spitzer establishes neither that the above statements were substantially true, nor that they were privileged under Civil Rights Law § 74. The documentary evidence included an informal judicial admission by Greenberg, made during testimony in another case, that he had "lost [his] job." While such an admission provides evidence of the fact admitted, it is not deemed conclusive (*see Ocampo v Pagan*, 68 AD3d 1077, 1078 [2009]) and, therefore, does not utterly refute Greenberg's contention that he resigned (*see Shofel v DaGrossa*, 133 AD3d 649, 650 [2015]; *Granada Condominium III Assn. v Palomino*, 78 AD3d 996, 997 [2010]; *Fontanetta v John Doe 1*, 73 AD3d at 86). In any event, the documentary evidence does not specifically tie Greenberg's removal from office to findings of fraudulent accounting. Therefore, the court erred in directing the dismissal of so much of the complaint as was based upon the Removal Statements made during the July 13 interview.

■ Paid Fine Statement. As regards the portion of Statement 1.5 in which Spitzer asserted that Greenberg "paid a fine of 1.6 billion dollars" (amended complaint ¶ 26 [emphasis omitted]), the Supreme Court erred in concluding that such statement was not reasonably susceptible of a defamatory connotation. Spitzer readily concedes that the statement was false, but insists it was an inadvertent error, emphasizing the fact that he had accurately stated, earlier during the July 13 interview, that AIG—not Greenberg—had paid the $1.6 billion fine. Nevertheless, taking into account the immediate context in which the false statement was made, on the heels of Spitzer's statements that "AIG was being led by a CEO whose accounting was fraudulent. That's why the board removed him," a reasonable listener could have concluded that the statement was conveying a fact about Greenberg that was susceptible of a defamatory connotation (*see Davis v Boeheim*, 24 NY3d at 269-270; *Martin v Daily News L.P.*, 121 AD3d at 100). Spitzer's contention that the statement was merely an inadvertent error

goes to the issue of malice, which presents a factual question that is not well suited to determination on a pre-answer motion to dismiss.

◼ Co-Conspirator Statements. As regards statements that Greenberg was a "co-conspirator in fraud" (amended complaint ¶ 26 [emphasis omitted]), a "conspirator whose actions began the conspiracy" (amended complaint ¶ 29), and "the one who instigated the conspiracy" (amended complaint ¶ 22 [emphasis omitted]), the Supreme Court erred in holding that such statements constituted a fair and substantially accurate report of the judicial proceeding in *United States v Ferguson* (553 F Supp 2d 145 [D Conn 2008] [hereinafter *Ferguson*]), and, therefore, were privileged under Civil Rights Law § 74. *Ferguson* involved the criminal prosecution of four former GenRe executives and one former AIG executive in connection with the GenRe transactions. The United States District Court held, in relevant part, that the evidence supported an inference that "the conspiracy to artificially inflate AIG's loss reserves and deceive the company's investors started with Greenberg's call . . . on October 31, 2000" (*id.* at 158). The United States Court of Appeals for the Second Circuit subsequently overturned the *Ferguson* defendants' convictions and ordered a new trial (*see United States v Ferguson*, 676 F3d 260 [2d Cir 2011]), but specifically upheld as not clearly erroneous the District Court's ruling that the conspiracy began on October 31, 2000 (*see id.* at 289).

Significantly, however, the Co-Conspirator Statements made during the July 13 interview went beyond merely summarizing or restating the *Ferguson* proceedings (*cf. Lacher v Engel*, 33 AD3d at 17). Rather, they were intertwined with allegedly defamatory remarks about Greenberg having engaged in fraud, having been "thrown out" by AIG's board of directors as a result of his misconduct, and having paid a $1.6 billion fine. When viewed in context, we cannot say, as a matter of law, that the statements provided substantially accurate reporting of the *Ferguson* case (*cf. Alf v Buffalo News, Inc.*, 21 NY3d at 990).

Viewpoint Appearance (Statements 2.1 and 2.2)

The allegations relating to the Viewpoint appearance concern the republication of several portions of the July 13 interview (*see* amended complaint ¶ 35), as well as Spitzer's statement reaffirming the truth and accuracy of his previous statements about Greenberg (*see* amended complaint ¶ 36).

Accordingly, to the extent that Spitzer's motion to dismiss the allegations relating to the July 13 interview must be

denied, we must also deny his request to dismiss the allegations relating to the Viewpoint appearance.

Protecting Capitalism (Statement 3.1)

Statement 3.1 is the final endnote from Protecting Capitalism. The statement contains several passages which Greenberg alleges are defamatory, as set out in paragraphs 44 through 51 of the amended complaint.

Republication of the July 13 Interview. Greenberg alleges that Spitzer republished his earlier defamatory remarks by stating: "It might be worth looking at my appearance on CNBC with Maria Bartiromo on July 13, 2012" (amended complaint ¶¶ 44-45). As Spitzer did not raise any argument with respect to this republication allegation (which does not neatly fall within any of the eight "categories" of defamatory statements articulated in his motion papers), he is not entitled to the dismissal of this portion of the amended complaint.

 Fraudulent Accounting Statement. As regards the Fraudulent Accounting Statement contained within Statement 3.1, our conclusion is different from the one we reached in connection with similar statements made in the context of the July 13 interview. Indeed, the Fraudulent Accounting Statement made in Protecting Capitalism asserts only that Greenberg was "charged by the New York Attorney General's office—when I was Attorney General—with civil fraud and deceptive accounting practices, as well as a raft of other abuses" (amended complaint ¶ 46 [emphasis omitted]). Contrary to Greenberg's contention, this is a fair and substantially accurate report of the complaint filed by the NYAG's office against Greenberg and others in 2005 and is therefore absolutely privileged (see Civil Rights Law § 74; Saleh v New York Post, 78 AD3d at 1152; McDonald v East Hampton Star, 10 AD3d 639, 640 [2004]; Glendora v Gannett Suburban Newspapers, 201 AD2d 620, 620 [1994]).

To the extent that Greenberg also alleges that Spitzer "misleadingly quoted from an article published in The New York Times regarding AIG's 2006 settlement with regulatory authorities, writing: 'Under the settlement reached with the Justice Department, the Securities and Exchange Commission, the New York attorney general's office, and the New York State Insurance Department, AIG acknowledged that it had deceived the investing public and regulators' " (amended complaint ¶ 47 [emphasis omitted]), we note that the statement is not "of and concerning" Greenberg and, therefore, cannot be defamatory as

to him (*Alf v Buffalo News, Inc.*, 100 AD3d 1487, 1488 [2012] [internal quotation marks omitted], *affd* 21 NY3d 988 [2013]; *see Three Amigos SJL Rest., Inc. v CBS News Inc.*, 28 NY3d 82, 86-87 [2016]).

■ DOJ Charges Statement. We also conclude that the Supreme Court erred in determining that Spitzer's statements that "the SEC and the [DOJ] charged [Greenberg] in 2009" and that Greenberg "settled for $15 million," as alleged in paragraph 51 of the amended complaint, were reasonably susceptible of a defamatory connotation. The documentary evidence established, as a matter of law, that the challenged statements were substantially true in that the SEC did in fact charge Greenberg in 2009 in connection with, inter alia, the GenRe transactions, and Greenberg did, in fact, settle those claims, without admitting or denying the underlying allegations, for $15 million (*see Goldberg v Levine*, 97 AD3d at 726; *Kamalian v Reader's Digest Assn., Inc.*, 29 AD3d 527, 528 [2006]). Spitzer concedes that he mistakenly wrote, in Protecting Capitalism, that the DOJ had joined in the claims brought by the SEC. However, "[w]hen the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done" (*Cafferty v Southern Tier Publ. Co.*, 226 NY 87, 93 [1919]; *see Klein v Prial*, 32 AD2d 925, 926 [1969], *affd* 28 NY2d 506 [1971]). Here, the statement that the SEC and the DOJ had brought claims against Greenberg could not have produced any discernibly different impact on readers than the "pleaded truth" that only the SEC had brought such charges (*Fleckenstein v Friedman*, 266 NY at 23). Greenberg argues that mere mention of the DOJ would suggest, in a reasonable reader's mind, that criminal charges had been brought against him. As Spitzer correctly notes, however, the DOJ has both civil and criminal divisions, so the involvement of the DOJ would not, without more, imply in a reasonable reader's mind that criminal charges had been brought.

■ Fifth Amendment Privilege Statements. The Supreme Court properly determined that the documentary evidence established, as a matter of law, that Spitzer's statements that "Greenberg invoked his Fifth Amendment right to avoid answering questions" (amended complaint ¶¶ 49-50 [emphasis omitted]) were substantially true (*see Goldberg v Levine*, 97 AD3d at 726; *Schaefer v Brookdale Univ. Hosp. & Med. Ctr.*, 66 AD3d 985, 985 [2009]; *Marks v Elephant Walk*, 156 AD2d 432,

433-434 [1989]). The fact that Spitzer did not state that Greenberg later withdrew his assertion of the privilege after all potential criminal statutes of limitation relating to the GenRe transactions had expired does not alter the accuracy of the challenged statements (*see Cafferty v Southern Tier Publ. Co.*, 226 NY at 93; *Klein v Prial*, 32 AD2d at 926).

 Co-Conspirator Statement. In paragraph 48 of the amended complaint, Greenberg alleges that Spitzer "falsely stated that . . . a federal judge had found that . . . Greenberg had initiated a 'conspiracy' to 'deceive investors.' "

Unlike similar statements made by Spitzer during the July 13 interview (which are discussed, supra), in Protecting Capitalism Spitzer accurately quoted passages directly from the *Ferguson* opinion (*see United States v Ferguson*, 553 F Supp 2d at 158), and also made clear that Greenberg "was deemed to be an *unindicted* co-conspirator by federal prosecutors" (amended complaint ¶ 50 [emphasis added]). In our view, Spitzer's account, in Protecting Capitalism, of the federal court proceedings in *Ferguson* is both fair and substantially accurate, thereby making the statement privileged (*see* Civil Rights Law § 74; *McDonald v East Hampton Star*, 10 AD3d at 640). Thus, the Supreme Court properly directed the dismissal of those portions of the amended complaint alleging such statement to be defamatory.

 Removal Statement. Also in paragraph 48 of the amended complaint, Greenberg alleges that Spitzer "falsely stated that . . . Greenberg had been removed as CEO by AIG's board." As we have previously noted, the mere fact of one's removal from office carries no imputation of dishonesty or lack of professional capacity (*see Nichols v Item Publs.*, 309 NY at 601; *Chang v Fa-Yun*, 265 AD2d 265 [1999]). Here, unlike in the context of Spitzer's previous remarks during the July 13 interview, the allegedly defamatory statement refers only to "the removal of Greenberg by the board" (amended complaint ¶ 48 [emphasis omitted]), which, in and of itself, carries no imputation of dishonesty or lack of professional capacity. Accordingly, the Supreme Court properly directed the dismissal of so much of the complaint as was based upon this allegation.

Protecting Capitalism (Statement 3.2)

 The Supreme Court properly determined that Statement 3.2, which compared the behavior of certain major companies, including Marsh & McLennan (a company at one time headed by Greenberg's son, Jeff Greenberg) to the

Gambino organized crime family, as alleged in paragraph 52 of the amended complaint, was not "of and concerning" Greenberg himself (*Alf v Buffalo News, Inc.*, 100 AD3d at 1488 [internal quotation marks omitted]; *see Cohn v National Broadcasting Co.*, 50 NY2d at 887). Moreover, in the context in which the challenged statement was made, a reasonable reader would have concluded that the statement was merely a "rhetorical flourish" and an expression of individual opinion (*Galanos v Cifone*, 84 AD3d 865, 867 [2011]; *see Goldberg v Levine*, 97 AD3d at 725-726).

Protecting Capitalism (Statement 3.3)

 The Supreme Court also properly determined that Statement 3.3, in which Spitzer implied that Greenberg and other members of New York Stock Exchange's compensation committee breached corporate governance rules and failed to independently perform their duties as directors of the New York Stock Exchange, were not actionable, as the context of the challenged statements was such that a reasonable reader would have concluded that he or she was reading opinions rather than facts about the plaintiff (*see Silverman v Daily News, L.P.*, 129 AD3d at 1055; *Kamalian v Reader's Digest Assn., Inc.*, 29 AD3d at 528; *Balderman v American Broadcasting Cos.*, 292 AD2d 67, 72-73 [2002]). Indeed, Statement 3.3 presents a classic example of pure opinion, consisting of a statement of opinion that recites the facts upon which it is based (*see Davis v Boeheim*, 24 NY3d at 269).

Protecting Capitalism (Statement 3.4)

 In Statement 3.4, Spitzer claimed that, in 2001, Greenberg "called [Richard] Grasso to complain that the specialist in AIG stock was not doing enough to keep the stock price high" and that "Grasso dutifully relayed Greenberg's concerns to the specialist in question, creating pressure to prop up the stock price" (emphasis omitted). Contrary to the Supreme Court, we do not conclude that the specific conduct ascribed to Greenberg (i.e., calling Grasso to complain about the specialist covering AIG stock) is reasonably susceptible of a defamatory meaning.

Under long-standing New York law, "[a] statement is defamatory if it exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprive[s] one of their confidence and friendly intercourse in society' " (*Chau v Lewis*, 771 F3d 118, 127 [2d Cir 2014], quot-

ing *Kimmerle v New York Evening Journal, Inc.*, 262 NY 99, 102 [1933]). In a more modern formulation, the Court of Appeals has stated that defamation consists of "a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace" (*Davis v Boeheim*, 24 NY3d at 268 [internal quotation marks omitted]).

Here, the statement that Greenberg called Grasso to complain about the performance of a third party does not expose Greenberg to public contempt, hatred, ridicule, aversion, or disgrace. Indeed, there may well have been legitimate reasons for the call, and a reasonable reader would not jump to the conclusion that Greenberg was asking anyone to break the law (*see Cohn v National Broadcasting Co.*, 50 NY2d 885, 887 [1980] ["courts will not strain to find a defamatory interpretation where none exists"]).

The remainder of Statement 3.4, which describes Grasso's subsequent call to the specialist, thereby "creating pressure to prop up the stock price," is not "of and concerning" Greenberg himself (*Chicherchia v Cleary*, 207 AD2d 855, 855 [1994] [internal quotation marks omitted]). Moreover, while the use of the term "prop up" suggests that Spitzer was of the opinion that the price of AIG stock was either high enough or too high at the time of Grasso's call, the statement itself falls well short of accusing Greenberg of violating any laws or stock market rules or of conspiring with Grasso in committing any such violations.

Sufficiency of Malice Allegations

██ Finally, viewing the allegations of the amended complaint as true, and according Greenberg the benefit of every favorable inference, the Supreme Court properly determined that the amended complaint adequately stated that Spitzer acted with actual malice (*see Kamchi v Weissman*, 125 AD3d at 159; *Weiss v Lowenberg*, 95 AD3d 405, 406 [2012]; *Kotowski v Hadley*, 38 AD3d at 500). Specifically, the amended complaint alleged, inter alia, that the defamatory statements were made with malice, that Spitzer continued to publish them notwithstanding their falsity, and that he did so solely to discredit Greenberg and damage his reputation and career, while attempting to bolster Spitzer's own reputation and career. Contrary to Spitzer's contention, "the burden does not shift to the nonmoving party on a motion made pursuant to CPLR 3211 (a) (7)," and therefore, "a plaintiff has no obligation to show evidentiary facts to support [his or her] allegations of malice on a

motion to dismiss pursuant to CPLR 3211 (a) (7)" (*Shaw v Club Mgrs. Assn. of Am., Inc.*, 84 AD3d 928, 931 [2011] [internal quotation marks omitted]; *see Sokol v Leader*, 74 AD3d at 1182).

## V. Conclusion

In light of the foregoing, the Supreme Court's order must be modified to the extent indicated herein.

Accordingly, the order is modified, on the law, by deleting the first and second decretal paragraphs thereof, and substituting therefor the following decretal paragraph: "ORDERED that the defendant's motion pursuant to CPLR 3211 (a) to dismiss the amended complaint is granted with respect to the allegations of defamation predicated on the statements set forth in paragraphs 46, 47, 48, 49, 50, 51, 52, 53, and 54 of the amended complaint, and the motion is otherwise denied; and it is further,"; as so modified, the order is affirmed insofar as appealed and cross-appealed from.

DILLON, J.P., AUSTIN and MILLER, JJ., concur.

Ordered that the order is modified, on the law, by deleting the first and second decretal paragraphs thereof, and substituting therefor the following decretal paragraph: "ORDERED that the defendant's motion pursuant to CPLR 3211 (a) to dismiss the amended complaint is granted with respect to the allegations of defamation predicated on the statements set forth in paragraphs 46, 47, 48, 49, 50, 51, 52, 53, and 54 of the amended complaint, and the motion is otherwise denied; and it is further,"; as so modified, the order is affirmed insofar as appealed and cross-appealed from, without costs or disbursements.